Jennifer ERICKSON, Plaintiff,

v.

**THE BARTELL DRUG COMPANY,**
Defendant.

No. C00–1213L.

United States District Court,
W.D. Washington,
at Seattle.

June 12, 2001.

**1268**

Lynn Lincoln Sarko, Keller Rohrback, Seattle, WA, Eve C Gartner, Donna Lee, Planned Parenthood Federation of America, New York, NY, Roberta N Riley, Planned Parenthood of Western WA, Seattle, for Jennifer Erickson, on behalf of herself and all others similarly situated, plaintiffs.

James Ralph Dickens, Miller Nash Wiener Hager & Carlsen, Seattle, WA, for Bartell Drug Company, defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

The parties' cross-motions for summary judgment in this case raise an issue of first impression in the federal courts' whether the selective exclusion of prescription contraceptives from defendant's generally comprehensive prescription plan constitutes discrimination on the basis of sex.[1] In particular, plaintiffs assert that Bartell's decision not to cover prescription contraceptives such as birth control pills, Norplant, Depo–Provera, intra-uterine devices, and diaphragms under its Prescription Benefit Plan for non-union employees violates Title VII, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).[2]

### A. APPLICATION OF TITLE VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1).[3] Unfortunately, the legislative history of the Civil Rights Act of 1964, of which Title VII is a part, is not particularly helpful in determining what Congress had in mind when it added protection from discrimination based on sex. The 1964 law, coming in the midst of the Civil Rights movement and the turmoil in the South, was predominately about racial fairness for blacks, not gender equity for

---

1. Bartell's benefit plan is self-insured and covers all prescription drugs, including a number of preventative drugs and devices, such as blood-pressure and cholesterol-lowering drugs, hormone replacement therapies, prenatal vitamins, and drugs to prevent allergic reactions, breast cancer, and blood clotting. The plan specifically excludes from coverage a handful of products, including contraceptive devices, drugs prescribed for weight reduction, infertility drugs, smoking cessation drugs, dermatologicals for cosmetic purposes, growth hormones, and experimental drugs.

2. Plaintiffs' complaint asserts claims of disparate treatment (first claim for relief) and disparate impact (second claim for relief).

Complaint at ¶¶ 39 and 41. Defendant seeks summary judgment on both the disparate treatment and disparate impact claims.

This matter is proceeding as a class action on behalf of "[a]ll female employees of Bartell who at any time after December 29, 1997, were enrolled in Bartell's Prescription Benefit Plan for non-union employees while using prescription contraceptives."

3. It is undisputed that fringe benefits, such as the prescription benefit plan at issue here, are part of the employees' "compensation, terms, conditions, or privileges of employment." *Newport News Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983).

women.[4] In fact, the late amendment that added "sex" to one portion of the proposed civil rights law came from a powerful Congressman from Virginia who may have been attempting to derail the proposed law by adding a classification that would be seen as controversial. The two hours of humorous debate on the amendment has since been described as "Ladies Day in the House." Yet whatever the motivation of the Congressman who moved the amendment (and who later voted against the entire Civil Rights Law), once sex was added to Title VII, all future attempts to remove it or limit it were defeated.[5]

■ The legislative history of Title VII does not forecast how the law was to be interpreted by future courts faced with specific examples of allegedly discriminatory conduct. The truth of the matter is, Congress' intent regarding the evolution of a law is rarely apparent from fragments of legislative history. Long before this particular dispute arose, the protections of Title VII had no doubt been applied in ways that were never anticipated by the Representatives and Senators who voted for it or the President who signed it into

law Nevertheless, Congress has generally chosen to interfere with the judiciary's interpretation of Title VII only where the courts attempted to restrict its application, as discussed below. What is clear from the law itself, its legislative history, and Congress' subsequent actions, is that the goal of Title VII was to end years of discrimination in employment and to place all men and women, regardless of race, color, religion, or national origin, on equal footing in how they were treated in the workforce.

■ In 1978, Congress had the opportunity to expound on its view of sex discrimination by amending Title VII to make clear that discrimination because of "pregnancy, childbirth, or related medical conditions" is discrimination on the basis of sex. 42 U.S.C. § 2000e(k). The amendment, known as the Pregnancy Discrimination Act ("PDA"), was not meant to alter the contours of Title VII: rather, Congress intended to correct what it felt was an erroneous interpretation of Title VII by the United States Supreme Court in *General Elec. Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).[6] In *Gil-*

---

4. The Civil Rights Act of 1964 was the culmination of decades of debate and political maneuvering over various civil rights proposals. In the end, it took three momentous events to finally propel the bill to the top of the agenda of Congress and the Administration. The first was the August 1963 march on Washington during which Dr. Martin Luther King, Jr., gave his famous "I have a dream" speech. The second was the September 1963 bombing of a black church in Birmingham, Alabama, in which four little girls were killed. The third was the assassination of President Kennedy, whose support for the bill carried even more weight in Congress and with the public after his untimely death. It was in this time that Bob Dylan warned, "Come Senators, Congressmen, please heed the call. Don't stand in the doorway, don't block up the hall" Bob Dylan, *The Times They Are A–Changin'*, on *The Times They Are A–Changin'* (Sony Music Entertainment/Columbia Records 1964).

After months of debate and a seventy-five day filibuster in the Senate, the bill finally passed and was signed into law by President Johnson on July 2, 1964.

5. For a more complete discussion of the events and legislative maneuvering from which Title VII arose, *see, e.g.,* 88 Cong. Rec. H2577 (daily ed. Feb. 8, 1964) (statement of Rep. Smith); Francis J Vaas, *Title VII: Legislative History*, 7 B.C. Indus. & Com. L.Rev. 431 (1965–66); and Jo Freeman, *How "Sex" Got Into Title VII: Persistent Opportunism as a Matter of Public Policy*, 9 Law and Ineq. 163 (1990–91).

6. Proponents of the PDA "repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to reestablish the principles of Title VII law as they

bert, the Supreme Court held that an otherwise comprehensive short-term disability policy that excluded pregnancy-related disabilities from coverage did not discriminate on the basis of sex. The *Gilbert* majority based its decision on two findings: (a) pregnancy discrimination does not adversely impact all women and therefore is not the same thing as gender discrimination; and (b) disability insurance which covers the same illnesses and conditions for both men and women is equal coverage. To the *Gilbert* majority, the fact that pregnancy-related disabilities were an uncovered risk unique to women did not destroy the facial parity of the coverage. The dissenting justices, Justice Brennan, Justice Marshall, and Justice Stevens, took issue with these findings, arguing that: (a) women, as the only sex at risk for pregnancy, were being subjected to unlawful discrimination; and (b) in determining whether an employment policy treats the sexes equally, the court must look at the comprehensiveness of the coverage provided to each sex. It was the dissenters' interpretation of Title VII which ultimately prevailed in Congress H.R.Rep. No. 95–948, at 2 (1978) ("Justice Brennan .. pointed out that since the plan included comprehensive coverage for males and failed to provide comprehensive coverage for females, the majority erred in finding that the exclusion of pregnancy disability coverage was a nondiscriminatory policy. Furthermore, Justice Stevens, in his dissenting opinion, argued that 'it is the capacity to become pregnant which primarily differentiates the female from the male.' It is the committee's view that the dissenting Justices correctly interpreted the Act.").

The language of the PDA was chosen in response to the factual situation presented in *Gilbert*, namely a case of overt discrimination toward pregnant employees. Not surprisingly, the amendment makes no reference whatsoever to prescription contraceptives. Of critical importance to this case, however, is the fact that, in enacting the PDA, Congress embraced the dissent's broader interpretation of Title VII which not only recognized that there are sex-based differences between men and women employees, but also required employers to provide women-only benefits or otherwise incur additional expenses on behalf of women in order to treat the sexes the same. *See, e.g., Arizona Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans v. Norris,* 463 U.S. 1073, 1084 n. 14, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983) (noting that the PDA buttresses the finding "that the greater cost of providing retirement benefits for women as a class cannot justify differential treatment based on sex").

■ Although this litigation involves an exclusion for prescription contraceptives rather than an exclusion for pregnancy-related disability costs, the legal principles established by *Gilbert* and its legislative reversal govern the outcome of this case. An employer has chosen to offer an employment benefit which excludes from its scope of coverage services which are available only to women. All of the services covered by the policy are available to both men and women, so, as was the case in *Gilbert,* "[t]here is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Gilbert,* 429 U.S. at 135, 97 S.Ct. 401 (quoting *Geduldig v. Aiello,* 417 U.S. 484, 496–97,

had been understood prior to the *Gilbert* decision." *Newport News,* 462 U.S. at 679, 103 S.Ct. 2622 (citing S.Rep. No. 95–331, pp. 7–8 (1977); H.R.Rep. No. 95–948, p. 8 (1978),

U.S.Code Cong. & Admin.News 1978, p. 4765; 123 Cong. Rec. 10581, 29387, 29647, and 29655 (1977); 124 Cong. Rec. 21436 (1978)).

94 S.Ct. 2485, 41 L.Ed.2d 256 (1974)). Nevertheless, the intent of Congress in enacting the PDA, even if not the exact language used in the amendment, shows that mere facial parity of coverage does not excuse or justify an exclusion which carves out benefits that are uniquely designed for women.

■ The fact that equality under Title VII is measured by evaluating the relative comprehensiveness of coverage offered to the sexes has been accepted and amplified by the Supreme Court. In *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983), the Supreme Court found that a health insurance plan which covered pregnancy-related costs for female employees, but not for the spouses of male employees, violated Title VII and the PDA. The court reasoned that because an employer cannot "provide complete health insurance coverage for the dependents of its female employees, and no coverage at all for the dependents of its male employees," the same result applies "even if the magnitude of the discrimination were smaller." *Newport News*, 462 U.S. at 682–83, 103 S.Ct. 2622. Thus, a policy which provided complete coverage to the male spouses of female employees but only partial coverage for the female spouses of male employees discriminated against the male employees. *Newport News*, 462 U.S. at 683–85, 103 S.Ct. 2622.

■ The other tenet reaffirmed by the PDA (*i.e.*, that discrimination based on any sex-based characteristic is sex discrimination) has also been considered by the courts. The Supreme Court has found that classifying employees on the basis of their childbearing capacity, regardless of whether they are, in fact, pregnant, is sex-based discrimination. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of Am. v.*

*Johnson Controls, Inc.*, 499 U.S. 187, 197–98, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). The court's analysis turned primarily on Title VII's prohibition on sex-based classifications, using the PDA merely to bolster a conclusion that had already been reached. To the extent that a woman's ability to get pregnant may not fall within the literal language of the PDA, the court was not overly concerned. Rather, the court focused on the fact that disparate treatment based on unique, sex-based characteristics, such as the capacity to bear children, is sex discrimination prohibited by Title VII.

■ Having reviewed the legislative history of Title VII and the PDA, the language of the statute itself, and the relevant case law, the Court finds that Bartell's exclusion of prescription contraception from its prescription plan is inconsistent with the requirements of federal law. The PDA is not a begrudging recognition of a limited grant of rights to a strictly defined group of women who happen to be pregnant. Read in the context of Title VII as a whole, it is a broad acknowledgment of the intent of Congress to outlaw any and all discrimination against any and all women in the terms and conditions of their employment, including the benefits an employer provides to its employees. Male and female employees have different, sex-based disability and healthcare needs, and the law is no longer blind to the fact that only women can get pregnant, bear children, or use prescription contraception. The special or increased healthcare needs associated with a woman's unique sex-based characteristics must be met to the same extent, and on the same terms, as other healthcare needs. Even if one were to assume that Bartell's prescription plan was not the result of intentional discrimi-

nation,[7] the exclusion of women-only benefits from a generally comprehensive prescription plan is sex discrimination under Title VII.

 Title VII does not require employers to offer any particular type or category of benefit. However, when an employer decides to offer a prescription plan covering everything except a few specifically excluded drugs and devices, it has a legal obligation to make sure that the resulting plan does not discriminate based on sex-based characteristics and that it provides equally comprehensive coverage for both sexes. *See Newport News,* 462 U.S. at 676, 103 S.Ct. 2622 (in evaluating fringe benefits under Title VII, the court must determine whether the benefit offered to one sex is less comprehensive than the protection afforded the other sex). In light of the fact that prescription contraceptives are used only by women, Bartell's choice to exclude that particular benefit from its generally applicable benefit plan is discriminatory.[8]

## B. Specific Arguments Raised by Defendant-Employer

Bartell argues that opting not to provide coverage for prescription contraceptive devices is not a violation of Title VII because: (1) treating contraceptives differently from other prescription drugs is reasonable in that contraceptives are voluntary, preventative, do not treat or prevent an illness or disease, and are not truly a "healthcare" issue; (2) control of one's fertility is not "pregnancy, childbirth, or related medical conditions" as those terms are used in the PDA; (3) employers must be permitted to control the costs of employment benefits by limiting the scope of coverage; (4) the exclusion of all "family planning" drugs and devices is facially neutral; (5) in the thirty-seven years Title VII has been on the books, no court has found that excluding contraceptives constitutes sex discrimination; and (6) this issue should be determined by the legislature, rather than the courts. Each of these arguments is considered in turn.

### (1) *Contraceptives as a health care need.*

An underlying theme in Bartell's argument is that a woman's ability to control her fertility differs from the type of illness and disease normally treated with prescription drugs in such significant respects that it is permissible to treat prescription contraceptives differently than all other prescription medicines.[9] The evidence submitted by plaintiffs shows, however,

---

7. There is no evidence or indication that Bartell's coverage decisions were intended to hinder women in their ability to participate in the workforce or to deprive them of equal treatment in employment or benefits. The most reasonable explanation for the current state of affairs is that the exclusion of women-only benefits is merely an unquestioned holdover from a time when employment-related benefits were doled out less equitably than they are today. The lack of evidence of bad faith or malice toward women does not affect the validity of plaintiffs' Title VII claim. Where a benefit plan is discriminatory on its face, no inquiry into subjective intent is necessary. *See Norris,* 463 U.S. at 1080–86, 103 S.Ct. 3492.

8. Bartell's argument that its prescription plan is not discriminatory because the female dependants of male employees are subject to the same exclusions as are female employees is unavailing First, discriminating against a protected class cannot be justified through consistency. Second, Bartell ignores the clear import of Congress' repudiation of *Gilbert:* a policy which uses sex-based characteristics to limit benefits, thereby creating a plan which is less comprehensive for one sex than the other, violates Title VII.

9. A similar argument was adopted by the majority in *Gilbert,* 429 U.S. at 136, 97 S.Ct. 401.

that the availability of affordable and effective contraceptives is of great importance to the health of women and children because it can help to prevent a litany of physical, emotional, economic, and social consequences. *See* Sylvia A. Law, *Sex Discrimination and Insurance for Contraception,* 73 Wash. L.Rev. 363, 364–68 (1998).

Unintended pregnancies, the condition which prescription contraceptives are designed to prevent, are shockingly common in the United States and carry enormous costs and health consequences for the mother, the child, and society as a whole. Over half of all pregnancies in this country are unintended. Committee on Unintended Pregnancy, Institute of Medicine, *The Best Intentions Unintended Pregnancy and the Well–Being of Children and Families* 1 (Sarah S. Brown & Leon Eisenberg eds., 1995).[10] A woman with an unintended pregnancy is less likely to seek prenatal care, more likely to engage in unhealthy activities, more likely to have an abortion, and more likely to deliver a low birthweight, ill, or unwanted baby Law, 73 Wash L.Rev. at 365–67. Unintended pregnancies impose significant financial burdens on the parents in the best of circumstances. If the pregnancy results in a distressed newborn, the costs increase by tens of thousands of dollars. Office of Technology Assessment, *Healthy Children: Investing in the Future* 85 (1988). In addition, the adverse economic and social consequences of unintended pregnancies fall most harshly on women and interfere with their choice to participate fully and equally in the "marketplace and the world of ideas." *Stanton v. Stanton,* 421

U.S. 7, 14–15, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). *See also Planned Parenthood v. Casey,* 505 U.S. 833, 856, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("The ability of women to participate equally in the economic and social life of the nation has been facilitated by their ability to control their reproductive lives.").

The availability of a reliable, affordable way to prevent unintended pregnancies would go a long way toward ameliorating the ills described above. Although there are many factors which help explain the unusually high rate of unintended pregnancies in the United States, an important cause is the failure to use effective forms of birth control. Alan Guttmacher Institute, *Contraception Counts: State–by–State Information* 1 (May 1997). Insurance policies and employee benefit plans which exclude coverage for effective forms of contraception contribute to the failure of at-risk women to seek a physician's assistance in avoiding unwanted pregnancies. Law, 73 Wash. L.Rev. at 364, 368–72.

The fact that prescription contraceptives are preventative appears to be an irrelevant distinction in this case: Bartell covers a number of preventative drugs under its plan.[11] The fact that pregnancy is a "natural" state and is not considered a disease or illness is also a distinction without a difference. Being pregnant, though natural, is not a state that is desired by all women or at all points in a woman's life. Prescription contraceptives, like all other preventative drugs, help the recipient avoid unwanted physical changes. As discussed above, identifying and obtaining an effective method of contraception is a primary healthcare issue throughout much of

---

**10.** "The most recent Washington State public health statistics parallel the national trend: 53.1% of all pregnancies in the state are unintended." Decl. of Thomas R. Easterling, M.D. at ¶ 24 (5/7/01) (citing Washington State Dept. of Health, *Office of Maternal and Child Health, Maternal and Child Health Five Year Needs Assessment,* July 2000).

**11.** *See supra* n. 1.

a woman's life and is, in many instances, of more immediate importance to her daily healthcare situation than most other medical needs. Decl. of Easterling at ¶ 7 (citing Vicki L. Seltzer & Warren H. Pearse, *Women's Primary Health Care: Office Practice and Procedures*, McGraw–Hill, Inc. 18, 141 (1995)). Although there are some distinctions that can be drawn between prescription contraceptives and the other prescription drugs covered by Bartell's plan, none of them is substantive or otherwise justifies the exclusion of contraceptives from a generally comprehensive healthcare plan.

### (2) *Pregnancy Discrimination Act*

Defendant argues that the exclusion of prescription contraceptives from defendant's prescription benefit plan does not run afoul of the PDA and is not, therefore, unlawful. Under the express terms of the PDA, discrimination because of "pregnancy, childbirth, or related medical conditions" is a form of prohibited sex discrimination. When Congress enacted the PDA, it clearly had in mind the obvious and then-commonplace practice of discriminating against women in all aspects of employment, from hiring to the provision of fringe benefits, based on an assumption that women would get pregnant and leave the workforce. This perception relegated women to the role of marginal, temporary workers who had no need to participate in seniority programs, no hope of promotion, and no claim to the full panoply of employment benefits.

Having reviewed the legislative history of the PDA, it is clear that in 1978 Congress had no specific intent regarding coverage for prescription contraceptives. The relevant issue, however, is whether the decision to exclude drugs made for women from a generally comprehensive prescription plan is sex discrimination under Title

VII, with or without the clarification provided by the PDA. The Court finds that, regardless of whether the prevention of pregnancy falls within the phrase "pregnancy, childbirth, or related medical conditions," Congress' decisive overruling of *General Elec. Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), evidences an interpretation of Title VII which necessarily precludes the choices Bartell has made in this case.

### (3) *Business Decision to Control Costs*

Bartell also suggests that it should be permitted to limit the scope of its employee benefit programs in order to control costs. Cost is not, however, a defense to allegations of discrimination under Title VII. *See Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 716–17, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); 29 C.F.R. § 1604.9(e). While it is undoubtedly true that employers may cut benefits, raise deductibles, or otherwise alter coverage options to comply with budgetary constraints, the method by which the employer seeks to curb costs must not be discriminatory. Bartell offers its employees an admittedly generous package of healthcare benefits, including both third-party healthcare plans and an in-house prescription program. It cannot, however, penalize female employees in an effort to keep its benefit costs low. The cost savings Bartell realizes by excluding prescription contraceptives from its healthcare plans are being directly borne by only one sex in violation of Title VII. Although Bartell is permitted, under the law, to use non-discriminatory cuts in benefits to control costs, it cannot balance its benefit books at the expense of its female employees.

### (4) *Neutrality of Exclusions*

Prescription contraceptives are not the only drugs or devices excluded from cover-

age under Bartell's benefit plan. Bartell argues that it has chosen to exclude from coverage all drugs for "family planning," and that this exclusion is neutral and non-discriminatory. There is no "family planning" exclusion in the benefit plan, however, and the contours of such a theoretical exclusion are not clear. On the list of excluded drugs and devices, contraceptive devices and infertility drugs are the two categories which might be considered "family planning" measures. Contrary to defendant's explanation, there appear to be some drugs which fall under the "family planning" rubric which are covered by the plan. Prenatal vitamins, for example, are frequently prescribed in anticipation of a woman becoming pregnant and are expressly covered under the plan. And although both parties agree that Bartell's plan excludes coverage for Viagra, an impotency drug, it is not clear that it falls into any of the excluded categories.[12]

Even if the Court were able to identify a consistent theory to explain the various exclusions and inclusions in Bartell's plan,[13] the exclusion of prescription contraceptives, alone or in combination with the exclusion of infertility drugs, is in no way neutral or equal. Although the issue is not before the Court, there is at least an argument that the exclusion of infertility drugs applies equally to male and female employees, making the coverage offered to all employees less comprehensive in roughly the same amount and manner.[14] The additional exclusion of prescription contraceptives, however, reduces the comprehensiveness of the coverage offered to female employees while leaving the coverage offered to male employees unchanged. As discussed above, such inequities are discriminatory and violate Title VII.

### (5) New Interpretation of an Old Law

Employers in general, and Bartell in particular, might justifiably wonder why, when Title VII has been on the books for thirty-seven years, this Court is only now holding that it includes a right to prescription contraceptives in certain circumstances. The answer, of course, is that until this case, no court had been asked to evaluate the common practice of excluding contraceptives from a generally comprehensive health plan under Title VII. While there are a number of possible explanations for the lack of litigation over this issue,[15] none of them changes the fact that, having now been properly raised as a matter of statutory construction, this Court is constitutionally required to rule on the issue before it.

■ Although the Court's decision is a matter of first impression for the judiciary, it is not the first tribunal to consider the lawfulness of a contraception exclusion. On December 14, 2000, the EEOC made a

---

**12.** Assuming Bartell is correct and its prescription benefit plan does not cover Viagra even when prescribed for the medical condition of impotency, such an exclusion may later be determined to violate male employees' rights under Title VII. This issue is not before the Court.

**13.** If the Court considers the third-party healthcare plans offered by Bartell, identifying a consistent explanation for the coverage choices Bartell has made becomes even more difficult. Abortion is, after all, the quintessential "family planning" measure, and yet it is covered in all circumstances, even though it is specifically excluded under the PDA.

**14.** The Court need not determine whether the exclusion of infertility drugs discriminates against women and simply notes that at least two courts have found that such an exclusion is not discriminatory. *See Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 679–80 (8th Cir.1996); *Saks v. Franklin Covey Co.*, 117 F.Supp.2d 318, 328–29 (S.D.N.Y.2000).

**15.** *See* Law, 73 Wash. L.Rev. at 386–91.

finding of reasonable cause on the same issue which is entitled to some deference. *See, e.g., EEOC v. Commercial Office Prod. Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988) ("[I]t is axiomatic that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility . . . need only be reasonable to be entitled to deference."). Although the Commission's analysis focused primarily on the PDA, it considered some of the arguments raised by Bartell in this case (such as the alleged distinctions between contraceptives and other drugs and the appropriateness of limiting coverage in order to contain costs). Most importantly, however, the enforcing agency's overall interpretation of Title VII comports with this Court's construction of the Act and led the Commission to the same conclusion reached by this Court. As the Commission found, the exclusion of prescription contraceptives from a generally comprehensive insurance policy constitutes sex discrimination under Title VII because the employers "have circumscribed the treatment options available to women, but not to men." This unequal treatment is an unlawful employment practice under Title VII of the Civil Rights Act of 1964.

#### (6) *Legislative Issue*

■ Although this litigation involves politically charged issues with far-reaching social consequences, the parties' dispute turns on the interpretation of an existing federal statute. The Court must determine whether, given the facts of this case and the scope of the coverage offered by defendant, the exclusion of prescription contraceptives from Bartell's prescription plan constitutes discrimination because of sex under Title VII. The normal rules of statutory construction, not the give and take of a legislative body, will guide this determination. Contrary to defendant's suggestion, it is the role of the judiciary, not the legislature, to interpret existing laws and determine whether they apply to a particular set of facts. *Chevron v. Natural Resources Defense,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("The judiciary is the final authority on issues of statutory construction . ."); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). While it is interesting to note that Congress and some state legislatures are considering proposals to require insurance plans to cover prescription contraceptives, that fact does not alter this Court's constitutional role in interpreting Congress' legislative enactments in order to resolve private disputes.[16]

#### C. CONCLUSION

■ The Court has carefully considered the pleadings of the parties, the arguments of counsel, and the authorities cited therein to determine whether the exclusion of a class of women-only prescription drugs from a generally comprehensive drug plan is discrimination on the basis of sex. For all of the foregoing reasons, the Court finds that Bartell's prescription drug plan discriminates against Bartell's

---

**16.** The federal and state legislative proposals on which Bartell relies for this argument appear to have a much broader scope and impact than Title VII does. Title VII applies to employers who have fifteen or more employees. If the federal proposal discussed by Bartell is enacted, not only would those employers have to include prescription contraceptives in their self-insured benefit plans, but employers of fewer than fifteen employees, insurance companies, and group health organizations would also have to make such benefits available on the same terms and conditions as they cover other prescription drugs S. 104, 107th Cong. (2001).

female employees by providing less complete coverage than that offered to male employees. Although the plan covers almost all drugs and devices used by men, the exclusion of prescription contraceptives creates a gaping hole in the coverage offered to female employees, leaving a fundamental and immediate healthcare need uncovered. Pursuant to the analysis in the *Gilbert* dissents, *Newport News,* and *Johnson Controls,* Title VII requires employers to recognize the differences between the sexes and provide equally comprehensive coverage, even if that means providing additional benefits to cover women-only expenses. *See also Manhart,* 435 U.S. 702, 98 S.Ct. 1370; *Norris,* 463 U.S. 1073, 103 S.Ct. 3492.

Plaintiffs' motion for summary judgment on their disparate treatment claim is GRANTED. Bartell is hereby ORDERED to cover each of the available options for prescription contraception to the same extent, and on the same terms, that it covers other drugs, devices, and preventative care for non-union employees. It is further ORDERED that Bartell shall offer coverage for contraception-related services, including the initial visit to the prescribing physician and any follow-up visits or outpatient services, to the same extent, and on the same terms, as it offers coverage for other outpatient services for its non-union employees. Because summary judgment in favor of plaintiffs is appropriate on their first claim for relief, the Court need not consider Bartell's motion for summary judgment regarding the disparate impact claim.