Commissioner Mike Kreidler Office of Insurance Commissioner P.O. Box 40255 Olympia, WA 98504-0255
Dear Commissioner Kreidler:
By letter previously acknowledged, you have requested our opinion on several questions, which we paraphrase as follows:
1. If an employer purchases employee healthcoverage, including coverage for prescription drugs, but declinesto purchase coverage for prescription contraceptives forconscientious reasons, citing RCW 48.43.065, may the healthcarrier charge individual employees/enrollees an additional amountfor the cost of supplying such prescription contraceptivecoverage, or would such charges constitute an unfair practiceprohibited by RCW 48.30.300 and RCW 48.30.010?
2. May the Office of Insurance Commissioner(OIC) require that a carrier recover any cost of a conscientiouslyobjecting employer's enrollee/employees' prescriptioncontraceptive coverage by including that cost as component in itsrate setting actuarial analysis?
 BRIEF ANSWERS
It would be an unfair practice for a health carrier to offer employees health coverage that generally includes the cost of prescription drugs but requires the employee to pay an additional amount to cover contraceptives. Although RCW 48.43.065
precludes requiring the employer to "purchase" coverage for services if the employer objects to doing so for reason of conscience or religion, the law may not preclude all mechanisms whereby an employer would provide payments to others without direct purchase of the services to which the employer objects.
As to the second question, conceptually, OIC could require that a carrier include the cost of contraceptive coverage as an expense component in its rate setting actuarial analysis; a more definite answer would have to be tailored to a more specific proposal.
 BACKGROUND
You have asked us to consider the application of RCW48.43.065 to an employer that has a religious or moral objection to purchasing prescription contraceptive health care coverage. We have been asked to assume the employer has purchased generally comprehensive health care coverage, including prescription drug coverage, and wishes only to exclude coverage for prescription contraceptives.
RCW 48.43.065 contains a "conscientious objection" clause that permits an employer to choose not to provide insurance coverage for medical services that the employer opposes. The statute states, in relevant part:
(3)(a) No individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion.
(b) The provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause in (a) of this subsection.
(c) The insurance commissioner shall define by rule the process through which health carriers may offer the basic health plan services to individuals and organizations identified in (a) and (b) of this subsection in accordance with the provisions of subsection (2)(c) of this section.
RCW 48.43.065(3)(a)-(c). The statute further provides that: "Nothing in this section requires a health carrier, health care facility, or health care provider to provide any health care services without appropriate payment of premium or fee." RCW48.43.065(4). Thus, the legislation leaves open questions regarding how and by whom payment is to be made to cover the health services required to be provided if the employer objects to purchasing coverage for reason of conscience or religion. We have examined the bill reports and other documentary legislative history of the conscience clause contained in the original enactment of the Health Care Reform Act of 1993 and the 1995 amendment. Laws of 1993, ch. 492, § 456; Laws of 1995, ch. 265, § 25. We found no legislative history that explains the legislative intent on these questions.
In enacting rules under RCW 48.43.065(3)(c) defining the manner in which health carriers may offer the basic health plan when a conscientious objection has been made, OIC must ensure that the process complies with RCW 48.43.065(2)(c). Section (2)(c) provides that OIC "shall establish by rule a mechanism or mechanisms to recognize the right to exercise conscience while ensuring enrollees timely access to services and to assure prompt payment to service providers." RCW 48.43.065(2)(c). Coverage of prescription contraceptive drugs and devices is included in the 2002 Basic Health Plan. See 2002 Basic Health Member Handbook, appendix A, p. 26, 32 (accessible atwww.wa.gov/hca/basichealth.htm).
 ANALYSIS
Question 1:
1. If an employer purchases employee healthcoverage, including coverage for prescription drugs, but declinesto purchase coverage for prescription contraceptives forconscientious reasons, citing RCW 48.43.065, may the healthcarrier charge individual employees/enrollees an additional amountfor the cost of supplying such prescription contraceptivecoverage, or would such charges constitute an unfair practiceprohibited by RCW 48.30.300 and RCW 48.30.010?
While your question focuses on whether charging individual employees/enrollees for the cost of supplying such coverage would be unfair discrimination within the provisions of RCW 48.30.300, we note as a preliminary matter that the terms of RCW 48.43.065 itself suggest employees/enrollees cannot be required to pay an extra charge in order to receive health services as a result of their employers' objection for reasons of conscience or religion. This is a strong inference from the language of RCW 48.43.065, which provides:
[W]hile recognizing the right of conscientious objection to participating in specific health services, the state shall also recognize the right of individuals enrolled with plans containing the basic health plan services to receive the full range of services covered under the plan.
Similarly, as noted above, RCW 48.43.065(3)(b) states:
The provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause in (a) of this subsection.
Thus, an enrollee cannot be denied "coverage of" and "timely access" to such services. This language appears to preclude requiring an enrollee to pay an extra charge to receive such services, especially when read in conjunction with the Legislature's statement recognizing the right of individuals enrolled in such plans "to receive the full range of services covered under the plan." There is no indication in the statute that the right to receive the full range of services and to be provided coverage and timely access to such services can be contingent on payment of additional fees by the enrollee.
This observation is consistent with rules providing that statutes are to be construed in their entirety, viewing each provision in relation to others and harmonizing them if at all possible. See State v. Keller, 143 Wn.2d 267, 277, 19 P.3d 1030
(2001). However, we do not analyze this point at length, because your question goes to how to read RCW 48.43.065 together with RCW48.30.300 in the circumstance where an employer purchases employee health coverage, including coverage for prescription drugs, but declines to purchase coverage for prescription contraceptives. Therefore, we analyze the question in that context.
RCW 48.30 addresses unfair practices and frauds. RCW 48.30.300
addresses unfair discrimination. The first section of the statute provides that:
Notwithstanding any provision contained in RCW Title 48 to the contrary:
(1) No person or entity engaged in the business of insurance in this state shall refuse to issue any contract of insurance or cancel or decline to renew such contract because of the sex or marital status, or the presence of any sensory, mental, or physical handicap of the insured or prospective insured. The amount of benefits payable, or any term, rate, condition, or type of coverage shall not be restricted, modified, excluded, increased or reduced on the basis of the sex or marital status, or be restricted, modified, excluded or reduced on the basis of the presence of any sensory, mental, or physical handicap of the insured or prospective insured. Subject to the provisions of subsection (2) of this section these provisions shall not prohibit fair discrimination on the basis of sex, or marital status, or the presence of any sensory, mental, or physical handicap when bona fide statistical differences in risk or exposure have been substantiated.
RCW 48.30.300(1).
Unfair practices are also addressed in a general manner by RCW 48.30.010, which grants authority to OIC to enact rules that define specific insurance practices as unfair. RCW48.30.010 states, in relevant part:
(1) No person engaged in the business of insurance shall engage in unfair methods of competition or in unfair or deceptive acts or practices in the conduct of such business as such methods, acts, or practices are defined pursuant to subsection (2) of this section.
(2) In addition to such unfair methods and unfair or deceptive acts or practices as are expressly defined and prohibited by this code, the commissioner may from time to time by regulation promulgated pursuant to chapter 34.05 RCW, define other methods of competition and other acts and practices in the conduct of such business reasonably found by the commissioner to be unfair or deceptive after a review of all comments received during the notice and comment rule-making period.
Pursuant to this statutory authority, OIC has determined that reduction of coverage or benefits on the basis of sex is an unfair practice. WAC 284-43-822 provides, in relevant part:
(1) It is an unfair practice for any health carrier to restrict, exclude, or reduce coverage or benefits under any health plan on the basis of sex. By way of example, a health plan providing generally comprehensive coverage of prescription drugs and prescription devices restricts, excludes, or reduces coverage or benefits on the basis of sex if it fails to provide prescription contraceptive coverage that complies with this regulation.
An example of a plan that provides generally comprehensive coverage of prescription drugs is a plan that covers prescription drugs but excludes some categories such as weight reduction or smoking cessation.
(2)(a) Health plans providing generally comprehensive coverage of prescription drugs and/or prescription devices shall not exclude prescription contraceptives or cover prescription contraceptives on a less favorable basis than other covered prescription drugs and prescription devices. Coverage of prescription contraceptives includes coverage for medical services associated with the prescribing, dispensing, delivery, distribution, administration and removal of a prescription contraceptive to the same extent, and on the same terms, as other outpatient services.
There are no Washington cases applying RCW 48.30.300, RCW48.30.010, or WAC 284-43-822 to sex-based discrimination, or addressing the question of insurance coverage of prescription contraceptives.
In prior decisions, the Washington Supreme Court has cautioned that it "will not invoke public policy to override an otherwise proper insurance contract in the absence of an expression of public policy from either the Legislature or a prior court decision." Cary v. Allstate Ins., 130 Wn.2d 335, 345,922 P.2d 1335 (1996). Although there are no Washington cases involving sex-based insurance discrimination, the Washington Supreme Court has cited RCW 48.30.300 in discussing Washington's "strong policy against sex discrimination." Roberts v. Dudley,140 Wn.2d 58, 66, 993 P.2d 901 (2000) (quoting Marquis v. City ofSpokane, 130 Wn.2d 97, 109, 922 P.2d 43 (1996)). In Roberts, the Court considered the case of a woman who was discharged from her job while on maternity leave. The Court found that she could bring an action for common law wrongful discharge in violation of the public policy against sex discrimination. The Court listed a number of state statutes prohibiting sex discrimination in both the public and private sectors, including RCW 48.30.300.[1]
In an older case addressing employment issues, the Washington Supreme Court found that disparate treatment based on a woman's reproductive capacity is sex-based discrimination. Hansonv. Hutt, 83 Wn.2d 195, 517 P.2d 599 (1973). In Hanson, the Court found that a statutory denial of unemployment benefits to pregnant women constitutes discrimination on the basis of sex. Id. at 202. The Court noted that "[w]hile it is over simplistic, it is true that only women become pregnant. It is equally clear that only women must remain barren to be eligible for . . . unemployment compensation." Id. at 198.
Both RCW 48.30.010 and RCW 48.43.300 impose limits on insurance carriers. Neither statute seeks to regulate the employer. However, since RCW 48.43.065(3) addresses employers, federal law concerning the employer's duty to provide nondiscriminatory insurance coverage is worthy of note. Title VII of the Civil Rights Act of 1964 (Title VII) states that an employer of more than 15 employees may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of the individual's race, color, religion, sex, or national origin.42 U.S.C. § 2000e-2(a)(1).[2]
The federal courts' application of Title VII to pregnancy-related issues has evolved over time. In 1974, the United States Supreme Court held that an otherwise comprehensive disability plan did not violate Title VII by failing to cover pregnancy related disabilities. Gen. Elec. Co. v. Gilbert,429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). In ruling that the exclusion of pregnancy related disabilities did not constitute gender discrimination, the Court focused on the fact that the same benefits were provided to both men and women. Id. at 138-39. In response to the General Electric case, Congress amended Title VII and added the Pregnancy Discrimination Act (PDA).42 U.S.C. § 2000e(k); Cal. Fed. Sav. Loan Ass'n. v. Guerra, 479 U.S. 272,284, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). The PDA broadened the scope of impermissible sex-based discrimination. The Act states, in relevant part:
The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title [42 U.S.C. § 2000e-2(h)] shall be interpreted to permit otherwise.
42 U.S.C. § 2000e(k).
Following enactment of the PDA, the United States Supreme Court held that providing the same benefits to men and women is insufficient to avoid violation of Title VII. NewportNews Shipbuilding Dry Dock Co. v. EEOC, 462 U.S. 669,103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). In Newport News, the Court considered a health insurance plan that provided female employees with comprehensive coverage for pregnancy-related conditions but did not provide the same benefits to the spouses of male employees. The Court found that this sex-based difference in coverage discriminated against male employees and therefore violated Title VII. Id. at 683-85. Offering identical benefits to both sexes was not sufficient to overcome a Title VII challenge. In 1991, the Court ruled that Title VII and the PDA prohibit employers from using sex-based classifications, such as the ability to bear children, regardless of whether the employees are actually pregnant. Int'l Union v. Johnson Controls, Inc.,499 U.S. 187, 197-98, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). The Court also has cited the PDA in ruling that the greater cost of providing retirement benefits for women does not justify differential treatment of the sexes. Ariz. Governing Comm. forTax Deferred Annuity and Deferred Comp. Plans v. Norris,463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983).
Most recently, the PDA has been applied to cases involving insurance coverage of prescription contraceptives. In 2001, the U.S. District Court for the Western District of Washington addressed Bartell Drug's decision not to provide employees with prescription contraceptive coverage. Erickson v.Bartell Drug Co., 141 F. Supp.2d 1266 (W.D.Wash. 2001). Bartell had a self-insured benefit plan that covered most prescription drugs but excluded coverage of prescription contraceptives. Id. at 1268. The district court stated that "[t]he PDA is not a begrudging recognition of a limited grant of rights to a strictly defined group of women who happen to be pregnant. Read in the context of Title VII as a whole, it is a broad acknowledgment of the intent of Congress to outlaw any and all discrimination against any and all women in the terms and conditions of their employment, including the benefits an employer provides to its employees." Id. at 1271. The court concluded that regardless of whether Bartell's exclusion of contraceptives was the result of intentional discrimination, "exclusion of women-only benefits from a generally comprehensive prescription plan is sex discrimination under Title VII." Id. at 1272. The court noted that its decision is consistent with a recent Equal Employment Opportunity Commission (EEOC) case, holding that exclusion of prescription contraceptives violates Title VII and cannot be characterized as a gender neutral exclusion. EEOC v. United Parcel Serv., Inc.,141 F. Supp.2d 1216 (2001). Although the district court cautioned that EEOC cases are not binding on the courts, it noted that the EEOC decision is entitled to deference. Bartell, 141 F. Supp.2d at 1275-76
(citing EEOC v. Comm'l Office Prod. Co., 486 U.S. 107,115, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988)).
A number of state courts have found the reasoning of the federal courts to be of assistance when interpreting state laws barring sex-based discrimination. For example, in ColoradoCivil Rights Comm'n v. Travelers Ins. Co., 759 P.2d 1358 (Colo. 1988), an insurance policy that excluded medical expenses associated with a normal pregnancy was found to be sex-based discrimination. The Colorado Supreme Court found that both the employer that provided its employees with the policy, and the insurance company that sold the policy, were acting in a discriminatory manner. Id. at 1366, 1371. Similarly, the Appellate Division of the New York Supreme Court ruled that "an employer which offers a comprehensive individual health insurance plan that denies benefits for pregnancy and childbirth clearly offers a less comprehensive plan to its female employees than to its male employees. A requirement that female employees must pay more for comprehensive coverage to include medical conditions unique to their sex than male employees pay for comprehensive coverage including all conditions unique to their sex is patently discriminatory." In re N.Y. State Dept. of Civil Serv. v.N.Y. State Human Rights Appeal Bd., 414 N.Y.S.2d 46, 49, 66 A.D.2d 309
(1979). Finally, the Oregon Court of Appeals held that provision of maternity benefits for female employees that are less comprehensive than the maternity benefits offered to the dependents of male employees is sex-based discrimination which violates both state law and Title VII. Hillesland v. Paccar,Inc., 80 Or. App. 286, 722 P.2d 1239 (1985).
Thus, in response to your first question, under state and federal law, offering a generally comprehensive prescription drug plan that excludes prescription contraceptives would constitute an unfair practice and is not an option for either insurance carriers or employers. The conscientious objection must be exercised in a manner that does not have a discriminatory impact. As is discussed more fully in response to Question 2, although a health carrier may not offer an otherwise comprehensive prescription drug plan that excludes prescription contraceptives, this should not be taken to mean that a health carrier may be compelled to provide insurance services without "appropriate . . . premium or fee." See RCW 48.43.065(4) ("Nothing [in the conscientious objection statute] requires a health carrier . . . to provide any health care services without appropriate payment of premium or fee.")
Before closing the discussion, we note that the "conscience clause" statute, RCW 48.43.065, protects an employer exercising the option from "purchasing" for its employees coverage to which the employer has a conscientious objection. For the reasons stated above, state and/or federal law prohibits charging the employees themselves for prescription contraceptive coverage, even if such coverage is the subject of an employer's conscientious objection. So long as the employer is not required to "purchase" the coverage, however, there might be lawful ways of covering these costs through more indirect employer charges.[3]
By specifying that an employer may not be "required to purchase
coverage," the Legislature focused on the situation where the employer would be a direct party to a transaction.[4] While some employers may object to even indirect participation, the Legislature balanced the competing values of religious and moral autonomy on the one hand and access to care on the other by providing a limited right of conscientious objection. We will not attempt, however, to describe such a concept in any level of detail, since the legal issues to be analyzed might vary greatly depending on the details of a particular proposal.[5]
Question 2:
2. May OIC require that a carrier recover anycost of a conscientiously objecting employer's enrollee/employees'prescription contraceptive coverage by including that cost ascomponent in its rate setting actuarial analysis?
You have asked whether OIC may, rather than charging a separate amount to each enrollee/employee who desires the coverage, require that a carrier recover the cost of a conscientiously objecting employer's enrollee/employees' prescription contraceptive coverage by including that cost as an administrative or overhead expense or otherwise as a component in its rate setting actuarial analysis. This question arises from the fact that RCW 48.43.065(3) limits what actions can be taken to cover the cost of providing the services to which an employer conscientiously objects, but it is silent as to what actions can
be taken to cover such costs. As noted above, RCW 48.43.065(3)(b) provides that an employer's objection to coverage "shall not result in an enrollee being denied coverage of, and timely access to, any service . . . excluded from their benefits package as a result of their employer's . . . exercise of the conscience clause". However, as previously noted, the conscientious objection cannot require a health carrier to provide health care services without "appropriate payment of premium or fee," either.
The burden falls on OIC to "establish by rule a mechanism or mechanisms to recognize the right to exercise conscience while ensuring enrollees timely access to services and to assure prompt payment to service providers." RCW48.43.065(2)(c). In response, OIC has enacted WAC 284-43-800(1). The rule requires insurance carriers to file with OIC "a plan providing benefits identical to the basic health plan" and describing the process the carrier will use to recognize conscientious objections to the purchase of specific coverage. WAC 284-43-800(1). The process used by the carrier is required to rely on "sound actuarial principles to distribute risk." WAC284-43-800(3)(c).
We interpret the provision in RCW 48.43.065(4) that nothing in the conscientious objection law requires health carriers to provide services "without appropriate payment of premium or fee" as reflecting the overall principle that the provision of these services should be in accordance with recognized insurance principles. The phrase "appropriate payment of premium or fee" provides little guidance. Pertinent to our situation are the observations of the United States Supreme Court as it construed a federal statute providing for the award of costs of litigation whenever a court determined that "such an award is appropriate." As the Supreme Court observed:
It is difficult to draw any meaningful guidance from § 307(f)'s use of the word "appropriate," which means only "specially suitable: fit, proper." Webster's Third International Dictionary [footnote omitted]. Obviously, in order to decide when fees should be awarded under § 307(f), a court first must decidewhat the award should be "specially suitable," "fit," or "proper"for. Section 307(f) alone does not begin to answer this question, and application of the provision thus requires reference to other sources, including fee-shifting rules developed in different contexts.
Ruckelshaus v. Sierra Club, 463 U.S. 680, 683, 103 S.Ct. 3274,77 L.Ed.2d 938 (1983) (emphasis in original). In a similar vein, we struggle to find any meaningful guidance from the phrase "without appropriate payment of premium or fee." What is appropriate must therefore be determined by looking to other sources — in this case the principles that have been applied to determine the appropriate premium or rate in the insurance context. We do not read RCW 48.43.065(4) as imposing any additional restrictions over and above the insurance principles that govern premiums and rates. Inclusion of the cost of prescription drug coverage as a component (such as an administrative, overhead, contingency, or other expense or allowance) in the actuarial analysis of a carrier's rates is therefore permissible under RCW 48.43.065 if it does not require employers to directly purchase the health service that is objected to; ensures enrollees will not be denied coverage of, and timely access to, any service or services excluded from their benefits package; does not require extra payments by the enrollee to receive coverage; and does not require carriers to provide services without "appropriate payment of premium or fee." Beyond these general observations, however, we will not attempt to analyze the details of particular concepts or proposals. This process is best left to a dialogue with your assigned legal counsel once you have identified a preferred approach from a policy standpoint.
We trust the foregoing will be of assistance.
Sincerely,
ANNE E. EGELER Assistant Attorney General
[1] In addition to citing RCW 48.30.300, the Court listed a number of other statutes "evidencing a public policy against gender discrimination," including RCW 28A.640.010 ("Inequality in the educational opportunities afforded women and girls at all levels of the public schools in Washington state is a breach of Article XXXI, section 1, amendment 61, of the Washington state Constitution, requiring equal treatment of all citizens regardless of sex."); RCW 74.04.515 (prohibiting discrimination based on sex for the purposes of public assistance); RCW 2.36.080 (prohibiting exclusion from jury pools based on gender); RCW 49.12.175(prohibiting sex discrimination in the payment of wages).Roberts, 140 Wn.2d at 67, n. 7.
[2] The Washington law against discrimination prohibits covered employers of eight or more persons from discriminating "against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin or" use of a service animal. RCW49.60.180(3). It also provides that it is an "unfair practice for any person whether acting for himself, herself, or another in connection with an insurance transaction" or transaction with an HMO "to cancel or fail or refuse to issue or renew insurance or a health maintenance agreement to any person because of sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental or physical disability" or the use of a service animal. RCW 49.60.178. The insurance commissioner and the human rights commission "have concurrent jurisdiction under this section." Id.
[3] There are other areas of the law where such accommodation has been made between competing values. For example, a number of states have laws that allow employees to decline to join a labor organization in recognition of associational freedom but still allow a labor organization to collect a fee from employees who do not join the organization, where the employee will benefit from the labor organization's activities such as collective bargaining.See, e.g., Grant v. Spellman, 99 Wn.2d 815, 664 P.2d 1227 (1983).
[4] As we understand it, the primary arguments made by conscientious objectors are (1) that direct participation makes the objectors more "complicit" in the conduct to which they object, and (2) that direct participation in purchasing coverage for objectionable services dilutes their ability to deliver strong messages on their religious or moral views by giving the appearance that the objecting institution does not consistently follow its own announced principles. We cannot easily assess whether a more indirect payment system would reduce or eliminate these objections.
[5] Your request included a number of questions, not set forth here, concerning OIC's authority to regulate health carriers' charges to individual enrollees/employees for the cost of the prescription contraceptive coverage. Since we have concluded that individual enrollees/employees cannot be required to pay an additional charge for such coverage, we do not address those questions in this opinion. We do not mean to comment one way or another on whether employers could exercise the conscience clause in a manner that provides payments to employees in lieu of prescription contraceptive coverage, which the employees could then use to purchase such coverage from the health carriers if they chose. This is not a regulatory scheme contemplated by your questions and raises a number of separate questions including issues related to privacy of the employees and compliance with Title VII.