109 Cal.Rptr.2d 176 (2001)
90 Cal.App.4th 425
CATHOLIC CHARITIES OF SACRAMENTO, INC., Petitioner,
v.
The SUPERIOR COURT of Sacramento County, Respondent;
Department of Managed Health Care et al., Real Parties in Interest.
No. C037025.
Court of Appeal, Third District.
July 2, 2001.
As Modified on Denial of Rehearing July 26, 2001.
Review Granted September 26, 2001.
*180 Law Office of James Francis Sweeney, Sacramento, James Francis Sweeney; Law Office of Tobin & Tobin, Paul Edward Gaspari, and Lawrence R. Jannuzzi, San Francisco, for Petitioner.
Gaglione, Coleman & Greene, Robert J. Gaglione, Sacramento; and Michael D. Ramsey for Catholic Charities USA as Amici Curiae on behalf of Petitioner.
Diepenbrock & Costa, Daniel P. Costa, Sacramento; and William Wood Bassett for California Catholic Conference as Amici Curiae for Petitioner.
Law Offices of Daniel P. Costa and Daniel P. Costa, Sacramento, for California Catholic Conference as Amicus Curiae for Petitioner.
Richard D. Ackerman, Corona, and Gary G. Kreep, Escondido, for Life Legal Defense Fund as Amici Curiae on behalf of Petitioner.
Alan Jay Reinach, Westlake Village, for The California Interfaith Coalition etc. et al. as Amicus Curiae for Petitioner.
Sidley & Austin, Rebecca K. Smith, Michael S. Lee, San Francisco, Gene C. Schaerr, Jeffrey A. Berman, and James M. Harris, Los Angeles, for Loma Linda University et al. as Amici Curiae on behalf of Petitioner.
No appearance for Respondent.
McCutchen, Doyle, Brown & Enersen, Beth Harrison Parker, San Francisco; Donna Lee, San Francisco; and Eve C. Gartner for Catholics for a Free Choice et al. as Amici Curiae on behalf of Respondent.
Bill Lockyer, Attorney General, Manuel M. Medeiros, Senior Assistant Attorney General, Kenneth R. Williams, Supervising Deputy Attorney General, Kathleen W. Mikkelson, and Daniel G. Stone, Deputy Attorneys General for Real Parties in Interest.
Catherine Weiss, Julie Sternberg, Margaret C. Crosby, Ann Brick for American Civil Liberties Union Reproductive Freedom Project et al. as amici curiae for Real Parties in Interest.
Lilly Spitz; Bebe J. Anderson; and Deborah Baumgarten for California Planned Parenthood Education Fund et al. as Amici Curiae for Real Parties in Interest.
McCutchen, Doyle, Brown & Enersen, Beth Harrison Parker, San Francisco; Donna Lee, San Francisco; and Eve C. Gartner for Catholics for a Free Choice et al. as Amici Curiae on behalf of Real Parties in Interest.
*181 SCOTLAND, P.J.
Asserting that, under the religious tenets of Catholicism, the use of contraception is extrinsically evil and a grave sin, Catholic Charities of Sacramento, Inc. (Catholic Charities), raises constitutional challenges to a statutory scheme which requires that, with an exception not applicable to Catholic Charities, California employers who provide their employees with health insurance coverage or disability insurance coverage that includes prescription drug benefits must also include prescription contraceptives in the coverage. (Health & Saf.Code, § 1367.25; Ins.Code, § 10123.196.)
Catholic Charities is a California public benefit corporation that provides social services to the poor, disabled, elderly, and otherwise vulnerable members of society, regardless of their religious beliefs. It has health insurance coverage with prescription drug benefits for its employees, who represent a diverse group of religious faiths. Catholic Charities believes that, by forcing it to provide prescription contraceptive coverage, the statutory scheme impermissibly burdens its sincerely held religious beliefs, thereby violating the religious freedom guarantees of both the United States Constitution and California Constitution.
Thus, Catholic Charities filed an action for declaratory and injunctive relief, and sought a preliminary injunction permitting it, pending trial, to provide its employees with health insurance that does not cover prescription contraceptives. When the superior court refused to issue a preliminary injunction, Catholic Charities sought relief in this court. We issued an alternative writ to address this issue of first impression.
We conclude, as did the superior court, it is not reasonably probable that Catholic Charities's action will prevail on the merits. As we will explain, the prescription contraceptive coverage statutes, which were enacted to eliminate discriminatory insurance practices that had undermined the health and economic well-being of women, are otherwise valid laws that are generally applicable and neutral with respect to religion. Because the statutes have a secular purpose, do not advance or inhibit religion, and do not foster excessive government entanglement with religion, the incidental effect of the statutes on religious beliefs does not violate the religious guarantees of the United States and California Constitutions.
Accordingly, we shall deny the petition for writ of mandate.

BACKGROUND

The statutory scheme and its purpose
The legislative history submitted by the parties discloses that the statutory scheme was enacted to eliminate discriminatory insurance practices which had undermined the health and economic well-being of women.
According to materials considered by the Legislature and statements made during the legislative hearings, prescription contraceptives statistically are the most effective methods of birth control and are an essential part of women's healthcare during their reproductive years, which span several decades.
Despite their importance to women's healthcare and their availability for four decades, prescription contraceptives are not included in 49 percent of health plan formularies; whereas most drugs approved by the Federal Drug Administration (FDA) appear almost immediately on *182 health plans. Oral contraceptives are the only class of FDA-approved prescriptions routinely excluded from insurance coverage.
Only women are burdened by this health coverage exclusion because prescription contraceptive methods are used only by women; there are no prescription contraceptive methods available for men.
Mainly due to this exclusion, women pay 63 to 68 percent higher out-of-pocket healthcare costs than men. Almost 5 million privately-insured women between the ages of 14 and 44 have out-of-pocket health expenditures exceeding 10 percent of their income. Women who cannot afford these additional costs must forgo using prescription contraceptive methods, which results in an increase in unwanted or unintended pregnancies. The average sexually active woman would have four pregnancies in five years if she did not use contraception.
The American College of Obstetricians and Gynecologists reports that unintended pregnancies can have serious medical, even life-threatening consequences to a woman's health. Unplanned pregnancies cause health problems not only for women, but also for their unplanned babies. Short intervals between pregnancies are associated with high risks of low birth weight and premature deliveries. Oral contraceptives also have nonpregnancy-related health benefits because they reduce the risk of contracting certain forms of cancer.
Hence, cost-effective access to prescription contraceptives results in substantial health benefits for women.
The Legislature also received information indicating that, in order for women to achieve and maintain economic and social parity and independence, it is essential that they have the ability to reliably control their reproductive capacity. Moreover, the ability of women to control reproductive health is a major factor in a nation's economic well being.
In response to these concerns, the Legislature enacted the Women's Contraception Equity Act (Health & Saf.Code, § 1367.25 & Ins.Code, § 10123.196; Stats. 1999, ch. 538, § 1), which requires group and individual health insurance policies and disability insurance policies that include prescription drug benefits to also include coverage for prescription contraceptive methods.[1] Hereafter, we will refer *183 to this legislation as "the prescription contraceptive coverage statutes."
During the legislative process, various Catholic groups asked the Legislature for a "conscience clause" which would enable them to obtain employee health insurance coverage that does not include prescription contraceptive benefits. The groups pointed out that, according to their religious beliefs, using contraception is a sin, and providing prescription contraceptive benefits is the equivalent of facilitating sin, which their religion prohibits. Therefore, they argued, without a "conscience clause" exception, the statutes would impermissibly burden their religious freedom.
The Legislature sought to address this concern without significantly undermining the anti-discrimination and public welfare goals of the prescription contraceptive coverage statutes, and without imposing the employers' religious beliefs on employees who did not share those beliefs. It reached a compromise by enacting an exemption that permits "religious employers," for whom contraception "is contrary to [their] religious tenets," to obtain employee health and disability insurance policies without coverage of prescription contraceptive methods. (Health & Saf.Code, § 1367.25, subd. (b); Ins.Code, § 10123.196, subd. (d).)
The "religious employers" exemption is defined narrowly. It applies only to those who satisfy the following four criteria: "(A) The inculcation of religious values is the purpose of the entity, [¶] (B) The entity primarily employs persons who share the religious tenets of the entity. [¶] (C) The entity serves primarily persons who share the religious tenets of the entity. [¶] (D) The entity is a nonprofit organization pursuant to Section 6033(a)(2)(A) i or iii of the Internal Revenue Code of 1986, as amended [which exempt from certain tax filings churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order]." (Health & Saf.Code, § 1367.25, subd. (b); Ins.Code, § 10123.196, subd. (d).)[2]
Catholic Charities concedes that it does not meet any of the four criteria necessary to qualify for the religious employer exception. It serves people of all faiths and does not proselytize or attempt to inculcate those it serves with its religious beliefs. Its employees, 74 percent of whom are not Catholic, come from a diverse group of religious faiths. It offers social *184 services to the general public that promote a just and compassionate society, reduce the causes of poverty, and build healthy communities. And it is a nonprofit public benefit organization exempt from federal income tax pursuant to section 501(c)(3) of the Internal Revenue Code, rather than section 6033(a)(2)(A)(i) or (iii) of that code.

The lawsuit
Because Catholic Charities does not qualify for the religious employer exception to the prescription contraceptive coverage statutes, it filed a complaint for injunctive and declaratory relief, and moved for a preliminary injunction pending trial.
The complaint and request for a preliminary injunction allege the following: Under the religious tenets of Catholicism, contraception is intrinsically evil and a grave sin. Catholics are precluded from facilitating sinful or evil conduct. Providing employee health insurance coverage that includes prescription contraceptive methods would facilitate financially the sin of contraception by employees who use the prescription drug benefit to obtain contraception. Catholic Charities cannot simply refuse to offer health insurance coverage for employees in order to avoid the burden placed upon its beliefs by the prescription contraceptive coverage statutes. This is so because the Catholic faith morally obliges employers to provide just employment wages and benefits, which includes adequate health insurance coverage. Thus, the statutes present Catholic Charities with the dilemma of either refusing to provide health insurance coverage for its employees or facilitating the sin of contraception, both of which violate its religious beliefs.
For these reasons, the complaint asserts that the prescription contraceptive coverage statutes impermissibly burden Catholic Charities's sincerely held religious beliefs in violation of the First Amendment of the United States Constitution and Article I, section 4 of the California Constitution.

The ruling on the request for a preliminary injunction
The superior court found no reasonable probability that Catholic Charities would prevail on the merits of its action because it has not shown that the prescription contraceptive coverage statutes unconstitutionally infringe upon its right to freely exercise its religion or that the statutes unconstitutionally favor one religion over another. Accordingly, the court denied Catholic Charities's motion for a preliminary injunction pending trial on the complaint.[3]

*185 DISCUSSION
Catholic Charities contends the superior court erred in denying the petition for a preliminary injunction on the ground that its complaint was not likely to succeed on the merits. According to Catholic Charities, the limited nature of the religious employer exemption to the prescription contraceptive coverage statutes violates, as a matter of law, both the Free Exercise Clause and Establishment Clause of the First Amendment of the United States Constitution as well as the California Constitution.
"Where [the preliminary injunction aspect of] the `likelihood of prevailing on the merits' factor depends upon a question of law rather than upon evidence to be introduced at a subsequent full trial, the standard of review is not abuse of discretion but whether the superior court correctly interpreted and applied [the] law...." (Efstratis v. First Northern Bank (1997) 59 Cal.App.4th 667, 671-672, 69 Cal.Rptr.2d 445.) Hence, we review de novo the merit of Catholic Charities's constitutional claims. (Ibid.)

I
We begin by addressing Catholic Charities's claim that the limited nature of the religious employer exemption violates the Free Exercise Clause of the United States Constitution because it impermissibly burdens Catholic Charities's religious beliefs about contraception without being justified by a compelling governmental interest.
The Free Exercise Clause protects the freedom "to believe and profess whatever religious doctrine one desires" and provides considerable, though not absolute, protection to practice one's religion. (Employment Division v. Smith (1990) 494 U.S. 872, 876-878, 110 S.Ct. 1595, 1598-1600,108 L.Ed.2d 876, 884-885.)
As noted by the United States Supreme Court in Employment Division v. Smith, supra, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (hereafter Smith), certain alleged violations of the Free Exercise Clause generally were subjected to a strict scrutiny standard of review prior to the Smith decision in 1990. A government regulation that imposed a substantial burden on an individual's right to free exercise of religion was constitutional only if it could be justified as the least restrictive means of furthering a compelling governmental interest. (Id. at p. 883, 110 S.Ct. at p. 1602, 108 L.Ed.2d at p. 888; Sherbert v. Verner (1963) 374 U.S. 398, 402-403, 83 S.Ct. 1790, 1792-1793, 10 L.Ed.2d 965, 969-970 (hereafter Sherbert).)
In Smith, the United States Supreme Court clarified that strict scrutiny does not apply to all free exercise challenges. An otherwise valid and constitutional law in an area in which the state is free to regulate, which law is neutral and of general applicability, need not be justified by a compelling governmental interest even if the law has the incidental effect of *186 burdening a particular religious practice. (Smith, supra, 494 U.S. at pp. 878-879, 884-885, 888-890, 110 S.Ct. at pp. 1599-1600, 1603, 1605-1606, 108 L.Ed.2d at pp. 885-886, 889-890, 892-893.)
Smith explained that the government's ability to enforce generally applicable prohibitions of socially harmful conduct or to carry out public policy "`cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' [Citation.] To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is `compelling'permitting him, by virtue of his beliefs, `to become a law unto himself,' [citation]contradicts both constitutional tradition and common sense." (Smith, supra, 494 U.S. at p. 885, 110 S.Ct. at p. 1603, 108 L.Ed.2d at p. 890, fn. omitted.) Applying the compelling government interest test in this fashion would produce "a private right to ignore generally applicable laws[which would be] a constitutional anomaly." (Id. at p. 886, 110 S.Ct. at p. 1604, 108 L.Ed.2d at p. 890.)
"Precisely because `we are a cosmopolitan nation made up of people of almost every conceivable religious preference,' [citation], and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order. [Such a rule] ... would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind.... The First Amendment's protection of religious liberty does not require this." (Smith, supra, 494 U.S. at pp. 888-889, 110 S.Ct. at p. 1605, 108 L.Ed.2d at p. 892, text, citations and fn. omitted.)
Smith noted that a society that wishes to protect religious belief can be expected to enact laws to foster religious freedom. "But to say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts. It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." (Smith, supra, 494 U.S. at p. 890, 110 S.Ct. at p. 1606, 108 L.Ed.2d at p. 893.)[4]
As we shall explain, the strict scrutiny test does not apply to prescription contraceptive coverage statutes at issue in this case because they are otherwise valid and constitutional laws, which are generally *187 applicable and neutral with respect to religion.
The Legislature's purpose in enacting the statutes was the elimination of gender discrimination in women's health insurance coverage (see summary of legislative history, ante) in an area afforded constitutional protection, i.e., reproductive freedom. (Eisenstadt v. Baird (1972) 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 [unmarried persons have a constitutionally protected right of privacy, which encompasses the right to obtain contraceptives]; Griswold v. Connecticut (1965) 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 [married persons have a right to obtain contraceptives]; Conservatorship of Valerie N. (1985) 40 Cal.3d 143, 161, 219 Cal.Rptr. 387, 707 P.2d 760 [right to use contraception is a fundamental constitutionally protected interest].)
The Legislature's interest in preserving public health and well-being is a compelling one (Goehring v. Brophy (9th Cir. 1996) 94 F.3d 1294, 1300), as is its interest in eliminating gender discrimination (cf. E.E.O.C. v. Fremont Christian School (9th Cir.1986) 781 F.2d 1362, 1368-1369 [by enacting Title VII, Congress targeted the elimination of all forms of discrimination as a highest priority]).
In a recent United States Equal Employment Opportunity Commission (EEOC) decision on coverage of contraception (Coverage Decision), the EEOC held that an employer's failure to offer prescription contraceptive coverage in its health insurance policy when it offers prescription drug coverage for other medical conditions is a discriminatory and unlawful employment practice that violates Title VII of the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act. ( [as of July 2, 2001].)
In reaching this conclusion, the EEOC reviewed the legislative history of the Pregnancy Discrimination Act (PDA), which prohibits discrimination against women "affected by pregnancy, childbirth, or related medical conditions." (42 U.S.C. § 2000e(k); see Pacourek v. Inland Steel Co. (N.D.Ill.1994) 858 F.Supp. 1393, 1402 [use of the phrase "or related medical conditions" in the PDA is meant to be expansive and suggests "that its interpretation should favor inclusion rather than exclusion in the close cases."].)
Relying on legislative history, the EEOC concluded that, in enacting the PDA, Congress intended "to address discrimination against female employees that was based on assumptions that they would become pregnant. Congress thus prohibited discrimination against women based on `the whole range of matters concerning the childbearing process,' and gave women `the right ... to be financially and legally protected before, during, and after [their] pregnancies.' It was only by extending such protection that Congress could ensure that women would not be disadvantaged in the workplace either because of their pregnancies or because of their ability to bear children." (Coverage Decision, supra, p. 6, fns. 7-9, at ; citing H.R.Rep. No. 948, 95th Cong., 2d Sess., §§ 3, 5 (1978); remarks of Sen. Williams, 123 Con. Rec. 29, 385 (1977); remarks of Rep. Sarasin, 124 Cong. Rec. H38, 574 (daily ed. Oct. 14, 1978); fns. omitted.)
Accordingly, the EEOC held the PDA necessarily encompasses a prohibition against discrimination related to a woman's use of contraceptives because contraception *188 is a means by which a woman controls her ability to become pregnant. (Coverage Decision, supra, at ; see also Law, Sex Discrimination and Insurance for Contraception (1998) 73 Washington L.Rev. 363, 381-382.) Thus, an employer's failure to include contraceptive methods in employee prescription benefits when other preventative-type prescription coverage is provided constitutes an unlawful employment practice in violation of the PDA because it circumscribes the treatment options available for women but not for men. (Coverage Decision, supra, at ; cf. Newport News Shipbldg. & Dry Dock v. EEOC (1983) 462 U.S. 669, 682, 103 S.Ct. 2622, 2630, 77 L.Ed.2d 89, 101 [health insurance and other fringe benefits are "`compensation, terms, conditions, or privileges of employment'" within the meaning of Title VII's prohibition against sex discrimination in employment]; see also 29 C.F.R. Pt. 1604, Appen. Intro, ["any health insurance provided must cover expenses for pregnancy-related conditions on the same basis as expenses for other medical conditions."].)
Citing EEOC v. Arabian American Oil Co. (1991) 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274, Catholic Charities asserts the EEOC decision is not entitled to any deference. However, the cited case does not hold that administrative decisions of the EEOC are never entitled to any deference. The case simply states that, because the EEOC has no authority to promulgate rules or regulations, the level of deference given to its administrative interpretation of Title VII depends upon "`"the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."' [Citation.]" (Id. at p. 257, 111 S.Ct. at p. 1235, 113 L.Ed.2d at p. 287.) In any event, a federal court recently agreed with the EEOC and held that an employer's decision to exclude prescription contraceptives from its employee health insurance benefits constitutes gender discrimination in violation of Title VII as amended by the PDA. (Erickson v. The Bartell Drug Company (W.D.Wash.2001) 141 F.Supp.2d 1266.)
Catholic Charities also cites General Electric Co. v. Gilbert (1976) 429 U.S. 125, 134-135, 97 S.Ct. 401, 407, 50 L.Ed.2d 343, 353 for the proposition that the fact a decision not to fund contraceptive prescriptions affects only women does not discriminate against women. But that case, which held the exclusion of pregnancy from coverage under a disability benefits plan was not discrimination on the basis of gender, was abrogated by Title VII of the Civil Rights Act of 1964 as amended by the PDA. (Newport News Shipbldg. & Dry Dock v. EEOC, supra, 462 U.S. at p. 670, 103 S.Ct. at p. 2624, 77 L.Ed.2d at p. 94.)
We are persuaded that California's Legislature was entitled to find that excluding prescription contraceptive methods from the prescription drug coverage of employee health insurance discriminates against women by excluding items essential to the medical needs of women during their reproductive years. (See summary of legislative history in BACKGROUND, ante.)
The prescription contraceptive coverage statutes enacted by the Legislature to prohibit such discrimination do not require employers to provide prescription contraceptive coverage to their employees. The statutes simply require that, if an employer chooses to provide employee health insurance *189 coverage with prescription drug benefits, it cannot provide coverage that discriminates against women by excluding prescription contraceptive methods.
Thus, the requirement that prescription drug benefit packages include coverage for prescription contraceptive methods is a neutral law of general application.
A religious exemption from this neutral and generally applied civic obligation is not required by the Free Exercise Clause. (Smith, supra, 494 U.S. at pp. 888-890, 110 S.Ct. at pp. 1605-1606, 108 L.Ed.2d at pp. 892-893.) Nevertheless, because various Catholic organizations expressed a desire for a "conscience clause" exemption from the prescription contraceptive coverage mandate, the Legislature chose to accommodate religious beliefs with an exemption for "religious employers," for whom contraception violates their religious tenets.
Such an accommodation is permissible without violating the Establishment Clause's prohibition against government endorsement of religion, but the accommodation must be neutral toward religion and among religions. (Corporation of Presiding Bishop v. Amos (1987) 483 U.S. 327, 334, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273, 282 (hereafter Amos); East Bay Asian Local Development Corp. v. State of California (2000) 24 Cal.4th 693, 712, 102 Cal. Rptr.2d 280, 13 P.3d 1122 (hereafter East Bay); Ehlers-Renzi v. Connelly School of the Holy Child, Inc. (4th Cir.2000) 224 F.3d 283, 287.)
The Legislature defined "religious employer" narrowly as an entity whose purpose is the inculcation of religious values, who employs and serves primarily persons who share the entity's religious tenets, and who is a nonprofit organization pursuant to a particular tax code section. (Health & Saf.Code, § 1367.25, subd. (b); Ins.Code, § 10123.196, subd. (d).) It had a rational, nondiscriminatory reason to limit the exemption in this fashion in order to reduce the concomitant infringement on employees' rights resulting from the religious accommodation, which serves to impose the employer's faith upon the employees, thereby burdening their religious beliefs. (United States v. Lee (1982) 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127, 134-135 [granting a religious exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees]; Smith v. Fair Employment & Housing Com. (1996) 12 Cal.4th 1143, 1170, 1174, 1176, 51 Cal. Rptr.2d 700, 913 P.2d 909 (hereafter Smith v. FEHQ.) To say that the employees may work elsewhere is to deny them the full choice of employment opportunities enjoyed by others in the workforce. (Cf. Smith v. FEHC, supra, 12 Cal.4th at p. 1175, 51 Cal.Rptr.2d 700, 913 P.2d 909.)
This balancing of religious accommodation against the rights of employees resulted in an exemption for a religious employer that primarily employs persons sharing its religious beliefs about contraception or primarily employs persons who, one reasonably could conclude based on the religious nature of the employment, agree with or willingly defer their personal choices to the religious tenets espoused by their employer.
The "religious employer" exemption is neutral and generally applicable to all religions. It does not discriminate among religions, but applies to all faiths in the same manner, exempting some but not all parts of all religious organizations.
Accordingly, strict scrutiny does not apply and the incidental effect that the prescription contraceptive coverage statutes have on the religious beliefs of *190 Catholic Charities does not violate the Free Exercise Clause of the United States Constitution. (Cf. Smith, supra, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876.)

II
Catholics Charities strongly disagrees with our conclusion that the prescription contraceptive coverage statutes are neutral laws of general application.
Citing Church of Lukumi v. Hialeah (1993) 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (hereafter Lukumi), Catholics Charities claims the statutes target religious conduct for distinctive treatment. Specifically, it argues that the religious employer exemption is not generally applicable because the limited definition of "religious employer" discriminates against the Catholic Church by excluding its various auxiliary organizations, which are integral parts of the church.
Lukumi holds that a law is not neutral, and thus is subject to heightened scrutiny, "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation...." (Lukumi supra, 508 U.S. at p. 533, 113 S.Ct. at p. 2227, 124 L.Ed.2d at p. 490.) Facial neutrality is not determinative; the reviewing court must survey the underlying circumstances to ensure that the law does not accomplish a "religious gerrymander," i.e., that it is not an impermissible attempt to target specific religious practices while excluding other religious or secular practices. (Id. at pp. 534-535, 113 S.Ct. at pp. 2227-2228, 124 L.Ed.2d at pp. 491-492.) In determining if the object of the law is a neutral one, relevant evidence includes the legislative or administrative history of the law. (Lukumi supra, 508 U.S. at p. 540, 113 S.Ct. at p. 2230,124 L.Ed.2d at p. 495.)
Lukumi involved ordinances prohibiting the sacrificial killing of animals for religious purposes. The laws were drafted in such a way that they protected the killing of animals for food, hunting, and various other purposes, just not for religious sacrifice. The legislative history disclosed that the laws were purposely drafted in such a manner as to burden only the Santeria religion. In fact, the ordinances were enacted only when proponents of the ordinances realized that the Santerians, who practice religious animal sacrifice, were planning to build a church in the community. (Lukumi supra, 508 U.S. at pp. 526-528, 534-537, 113 S.Ct. at pp. 2223-2224, 2227-2229, 124 L.Ed.2d at pp. 485-487, 491-493.) Therefore, because the ordinances had as their object the suppression of religion, they were not neutral laws of general application, and were unconstitutional unless they withstood strict scrutiny. (Lukumi supra, 508 U.S. at pp. 542, 545-546, 113 S.Ct. at pp. 2231, 2233-2234, 124 L.Ed.2d at pp. 496, 498.)
Unlike the situation in Lukumi where the very object of the laws was to discriminate against Santeria religious practices by outlawing them, the object of the prescription contraceptive coverage statutes is not to infringe upon or restrict Catholics' beliefs about contraception because of their religious motivation, but to accommodate those beliefs to the extent possible while protecting the rights of employees and effectuating the legislative purpose of eliminating gender discrimination in health insurance coverage. Some Catholic employers are exempt from the mandate and others are not, but all religions are treated identically. The limited exemption does not cover all religious-affiliated ancillary organizations engaged in "secular-type" pursuits. The Catholic Church is not the only religious entity with affiliated institutions engaged in secular activities; therefore, *191 it is not the only church whose affiliated entities do not qualify as "religious employers" under the challenged statutory criteria.
There is nothing impermissible about granting an exemption for certain but not all activities. (E.g., First Assembly of God v. Collier County, Fla. (11th Cir.1994) 20 F.3d 419 (hereafter First Assembly).)
For example, in First Assembly, a church contested enforcement of certain zoning ordinances, one of which designated the area in which the church was located as a multi-family residential district and also permitted a number of community uses, including churches and their "customary accessory uses." The church was operating a homeless shelter, but the code enforcement board ordered the shelter to close because the board determined that a homeless shelter was not a customary accessory use for a church. (Id. at p. 420.) The church disagreed, contending that sheltering the homeless is an essential aspect of the Christian religion. (Id. at p. 422.)
The district court held the zoning ordinance did not violate the Free Exercise Clause and that strict scrutiny was not required because the ordinance was a neutral law of general application. "This ordinance, as passed, zones an entire residential area and makes a special exception for churches. It is neutral on its face and is of general applicability." (First Assembly, supra, 20 F.3d at p. 423.) The fact that the ordinance did not exempt all activity of a religious nature did not negate its neutrality and general applicability.
Catholic Charities argues the legislative history suggests the statutory exemption to the prescription contraceptive coverage statutes is not facially neutral because (1) only the Catholic Church has a core teaching against artificial contraception and also operates an extensive network of hospitals, schools, and social service agencies; (2) only Catholic employers were discussed specifically during the legislative process; and (3) only the Catholic Church opposed the enactment of the statutes. Therefore, it claims the exemption was carefully gerrymandered to discriminate against the Catholic Church. We disagree.
It is because Catholic groups were the only ones who requested an exemption from the prescription contraceptive coverage statutes that Catholic religious beliefs were discussed in the legislative process. Certainly, the Legislature cannot be faulted for responding to the concerns those groups raised during the process.
Moreover, the Legislature's refusal to accede to demands for a broader exemption does not necessarily render the exemption discriminatory. The portions of the record cited by Catholic Charities disclose the legislative discussions were not hostile to Catholicism. There is nothing indicating that the limitation of the exemption was intended to target Catholic employers' beliefs about contraception, rather than simply protect the rights of employees to be free from gender discrimination in insurance coverage.
If, as Catholic Charities alleges, Catholicism is the only religion that prohibits artificial contraception and, thus, is the only one burdened by the limitation of the exemption, then it also is the only religion that benefits from the religious employer exemption enacted by the Legislature. This cannot be viewed as an attempt to target Catholic religious practices for unfavorable treatment.
Even if the narrow definition of "religious employers" is construed as having a disparate impact in that it affects only the Catholic Churchbecause allegedly only *192 the Catholic Church prohibits contraception and only its auxiliary organizations would be burdened by not falling within the exemption-this is insufficient to make the exemption facially discriminatory. (Children's Health. Is A Legal Duty v. Min De Parle (8th Cir.2000) 212 F.3d 1084, 1091) (hereafter Children's Health.) "In addition to disparate impact, a `claimant alleging "gerrymander" must be able to show the absence of a neutral, secular basis for the lines government has drawn.'" (Ibid., quoting Gillette v. United States (1971) 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168, 182; see also Lukumi, supra, 508 U.S. at p. 535, 113 S.Ct. at pp. 2227-2228, 124 L.Ed.2d at p. 492.)
The secular purpose of the prescription contraceptive coverage statutes is to prevent discrimination against women in healthcare insurance, and the exemption is limited so as not to discriminate among religions or restrict religious practices, but to ensure the viability of this statutory purpose (cf. Droz v. Commissioner of I.R.S. (9th Cir.1995) 48 F.3d 1120, 1124) as well as to protect employees from the imposition of their employer's religious beliefs (United States v. Lee, supra, 455 U.S. at p. 261, 102 S.Ct. at p. 1057, 71 L.Ed.2d at pp. 134-135; Smith v. FEHC, supra, 12 Cal.4th at pp. 1170, 1174, 1176, 51 Cal. Rptr.2d 700, 913 P.2d 909).
Accordingly, the exemption was not carefully gerrymandered in order to burden only the Catholic Church, while exempting all other religions. In other words, it is neutral and generally applicable.

III
Citing Lukumi, supra, 508 U.S. at pages 537-538, 113 S.Ct. at page 2229, 124 L.Ed.2d at page 493, Catholic Charities contends that, where a system of, or mechanism for, individualized exemptions from a general requirement is available, the government may not refuse to extend the system to cases of "religious hardship" without a compelling reason. Catholic Charities asserts that such a system exists here because the Legislature provided a limited exemption for religious employers from the prescription contraceptive coverage statutes. It argues that the Legislature's refusal to extend the exemption to cover Catholic Charities "suggests a discriminatory intent" and "tends to exhibit hostility, not neutrality, towards religion." (Bowen v. Roy (1986) 476 U.S. 693, 708, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735, 750; see also Keeler v. Mayor & City Council of Cumberland (D.Md.1996) 940 F.Supp. 879, 886.) Therefore, it contends, we must apply the strict scrutiny standard of review.
The cited cases did not hold that the strict scrutiny test enunciated in Sherbert, supra, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 applies any time statutory exemptions of any kind are enacted by the Legislature. Rather, they held that the strict scrutiny test applies where (1) there is a mechanism of exemptions open to unfettered discretionary interpretation, and (2) the bureaucratic discretion is enforced in a discriminatory manner against religion. (Lukumi, supra, 508 U.S. at pp. 537-538, 113 S.Ct. at pp. 2229-2230, 124 L.Ed.2d at p. 493 [only unnecessary killings of animals were prohibited and only sacrificial religious killings were deemed unnecessary, while hunting and most other killings fell outside the prohibition]; Smith, supra, 494 U.S. at p. 884, 110 S.Ct. at pp. 1602-1603, 108 L.Ed.2d at p. 889 [Sherbert test was developed in a context that lent itself to individualized governmental assessment of the reasons for the *193 relevant conduct]; Bowen v. Roy, supra, 476 U.S. at p. 708, 106 S.Ct. at p. 2156, 90 L.Ed.2d at p. 750 [discussing Sherbert, which required an assessment of "good cause" for quitting or refusing to work in order to obtain unemployment compensation benefits, and religious reasons were not considered good cause]; Keeler v. Mayor & City Council of Cumberland, supra, 940 F.Supp. at p. 886 [exemptions from ordinance preserving historic buildings required bureaucratic assessment of "deterrent," "substantial benefit," "undue financial hardship" and "best interest," and this assessment was conducted in a manner that discriminated against religion]; see also Rader v. Johnston (D.Neb.1996) 924 F.Supp. 1540, 1552-1553 [university administrators exercised their discretion to grant exceptions to prohibition against off-campus housing in a broad range of secular situations, but refused to do so for religious observers who wished to live at a Christian housing facility].)
The concern underlying the "individualized exemption" exception seeks to prevent the government from deciding that secular motivations are more important than religious motivations. (Fraternal Order of Police Newark v. City of Newark (3d Cir. 1999) 170 F.3d 359, 365.) Consequently, the government may not create a categorical exemption for individuals with a secular objection to a law or regulation but not for individuals with a religious objection. (Ibid.)
Here, there are four objective criteria for determining whether the religious employer exemption in the prescription contraceptive coverage statutes applies. They do not require an individualized assessment of discretionary criteria that may be applied in a discriminatory fashion between religious employers of different faiths, or against religious employers in favor of secular employers. They do not create a categorical exemption for secular employers; rather, they create an exemption for religious employers except for those engaged in what could be termed secular pursuits.
In effect, Catholic Charities argues that, in cases where the Legislature is not required to grant an exemption accommodating religious beliefs but does so, then the statute is no longer neutral because it is not all-inclusive, even if the exemption benefits parts of all religious organizations equally as opposed to benefiting one religion over another. Thus, Catholic Charities apparently believes the Legislature must exempt all parts of all religious organizations so as not to discriminate within each religion against nonexempt parts of the religious organizations. In other words, although there is no free exercise claim requiring an exemption from the statute, once the Legislature attempts to accommodate religion with a religious exemption, it cannot limit the exemption for any reason, including a valid secular one, unless the interest is a compelling one.
The Constitution does not compel such a nonsensical result, which, despite the existence of a valid secular purpose to do so, would discourage the Legislature from making any accommodation.

IV
Catholic Charities contends there is an exception to the holding in Smithan exception that requires the strict scrutiny test articulated in Sherbert to be used when the free exercise claim of a church is involved as opposed to the free exercise of an individual's religious actions and beliefs. (Citing Gellington v. Christian Methodist Episcopal Church (11th Cir.2000) 203 F.3d 1299 (hereafter Gellington); Combs v. Cen. Tx. Ann. Conf. of United Methodist Church (5th Cir.1999) 173 F.3d 343 (hereafter *194 Combs).) Asserting it is part of the Catholic Church, Catholic Charities argues that it is entitled to application of the strict scrutiny test.
Catholic Charities misinterprets these cases, which simply held the ministerial exception to Title VII of the Civil Rights Act of 1964 survived Smith. (Gellington, supra, 203 F.3d at pp. 1302-1304; Combs, supra, 173 F.3d at pp. 347-350.)
The ministerial exception exempts from the coverage of various employment laws the employment relationships between religious institutions and their ministers or clergy. "`As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered "clergy" [for purposes of the exception].' [Citation]." (Rayburn v. General Conf. of Seventh-Day Adventists (4th Cir. 1985) 772 F.2d 1164,1169.)
The reason for the ministerial exception is that applying employment laws to employment relationships between religious institutions and their ministers or clergy would cause the state to intrude upon matters of church administration and government, which are matters of a singular ecclesiastical concern. (Combs, supra, 173 F.3d at p. 347.) In contrast, the ministerial exception does not apply to lay employees of a religious institution if they are not serving the function of ministers; this is so because the strong religious interest surrounding a church's choice of its representative is absent. (Bollard v. California Province of Soc. of Jesus (9th Cir.1999) 196 F.3d 940, 947.) Therefore, religious employers are not immune from liability under Title VII for gender discrimination against lay employees. (Id. at p. 947; E.E.O.C. v. Fremont Christian School, supra, 781 F.2d at p. 1366.)
Government action may burden the free exercise of religion in two ways: "by interfering with a believer's ability to observe the commands or practices of his faith, ... and by encroaching on the ability of a church to manage its internal affairs." (E.E.O.C. v. Catholic University of America (D.C.Cir.1996) 83 F.3d 455, 460.) The cited cases reasoned that Smith focused on the former type of free exercise burden. The ministerial exception is not invoked to protect the freedom of an individual to observe a particular command of his or her church. Rather, it is designed to protect the freedom of the church to select those who will carry out its religious mission. Hence, the ministerial exception continues to apply even if the employment law in question is a neutral law of general application. (Gellington, supra, 203 F.3d at pp. 1303-1304; Combs, supra, 173 F.3d at pp. 348-349.)
Here, we are not dealing with the ministerial exception to Title VII or with the administration of the Catholic Church's internal affairs. Accordingly, Catholic Charities's reliance on the cited cases is unavailing.

V
According to Catholic Charities, Smith indicates that strict scrutiny applies where a free exercise claim is combined with another alleged violation of a constitutional right such as free speech or the Establishment Clause, thereby presenting what is known as a "hybrid rights" claim. (See Smith, supra, 494 U.S. at pp. 881-882, 110 S.Ct. at pp. 1601-1602, 108 L.Ed.2d at pp. 887-888; E.E.O.C. v. Catholic University of America, supra, 83 F.3d at p. 467.)
*195 Some courts appear to reject the hybrid rights doctrine (Kissinger v. Board of Trustees (6th Cir.1993) 5 F.3d 177, 180), and others disagree on the strength of the additional constitutional claim required to assert a hybrid rights claim (see Miller v. Reed (9th Cir.1999) 176 F.3d 1202, 1207, and cases cited therein). Assuming it exists, to assert a hybrid rights claim, a free exercise plaintiff must at a minimum "`make out a "colorable claim" that a companion right has been violatedthat is, a "fair probability" or a "likelihood," but not a certitude, of success on the merits.' [Citation]." (Miller v. Reed, supra, at p. 1207.)
In a conclusory fashion, Catholic Charities contends it "demonstrated that the [prescription contraceptive coverage] statutes carry grave restrictions on its constitutionally protected free speech rights, as well as on its First Amendment Free Exercise rights. The ... statutes force Catholic Charities to foster concepts and to engage in symbolic speech that sends a message that contraception is morally, socially, legally and religiously acceptable conduct." (Citing Wooley v. Maynard (1977) 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752, 762 (hereafter Wooley) [invalidated the compelled display of a license plate slogan that offended an individual's beliefs].)
Catholic Charities has not stated a colorable claim of infringement of its free speech rights. The prescription contraceptive coverage statutes do not require Catholic Charities to repeat an objectionable message out of its own mouth or to use its own property, such as the license plate in Wooley, to display an antagonistic message. Nor is it publicly identified or associated with another's message. (Cf. Glickman v. Wileman Bros. & Elliott (1997) 521 U.S. 457, 470-471, 117 S.Ct. 2130, 2138-2139, 138 L.Ed.2d 585, 600-601.)
Catholic Charities is not required to speak but, having chosen to provide employee health insurance coverage with prescription drug benefits, it simply is required to provide benefits that do not discriminate against women. The mere fact that coverage must be provided for certain items and medications is not likely to be viewed as an endorsement of the use of these items and medications. Catholic Charities remains free to advise its employees that it is morally opposed to prescription contraceptive methods and to counsel them to refrain from using such methods.
Catholic Charities also relies on an alleged violation of the Establishment Clause to support its hybrid rights contention. However, as we shall explain in part VII, post, Catholic Charities has not stated a colorable establishment clause claim. Accordingly, it has not stated a cognizable hybrid rights claim, and we need not apply heightened scrutiny to its free exercise claim.
For all of the reasons expressed above, Catholic Charities has failed to establish a violation of the Free Exercise Clause of the United States Constitution.

VI
Catholic Charities turns to the California Constitution as a separate basis for overturning the superior court's order. Citing Smith v. FEHC, supra, 12 Cal.4th at page 1177, 51 Cal.Rptr.2d 700, 913 P.2d 909, it notes that the interpretation of our state Constitution's free exercise clause is not dependent upon the manner in which the corresponding federal clause has been applied because our state clause is broader than the federal clause.[5] According to *196 Catholic Charities, People v. Woody (1964) 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (hereafter Woody) compels us to use a strict scrutiny standard of review akin to that used in Sherbert, supra, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, rather than the standard of review set forth in Smith supra, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876. We disagree.
In Woody, which was decided prior to Smith, the California Supreme Court used a strict scrutiny standard of review to conclude that the application of a criminal statute to convict defendants who were Navajos using peyote in a bona fide religious practice violated their First Amendment rights because their religious practice did not frustrate a compelling state interest. (Woody, supra, 61 Cal.2d at pp. 717, 727, 40 Cal.Rptr. 69, 394 P.2d 813.) Although the defendants also claimed the criminal statute violated their free exercise rights under the California Constitution (id. at p. 718, fn. 1), Woody did not evaluate this state claim separately from the federal claim or determine whether strict scrutiny applies to a state claim regardless of the standard of review applied to the federal claim.
Because Woody simply applied the then-existing federal standard of review to the defendants' claim under the federal Constitution (Woody, supra, 61 Cal.2d at p. 718, 40 Cal.Rptr. 69, 394 P.2d 813), Catholic Charities's reliance on Woody is misplaced. The same is true with respect to its reliance on other California Supreme Court cases cited in its points and authorities. (Walker v. Superior Court (1988) 47 Cal.3d 112, 139-140, 253 Cal.Rptr. 1, 763 P.2d 852; Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1112-1119, 252 Cal. Rptr. 122, 762 P.2d 46; In re Arias (1986) 42 Cal.3d 667, 692, 230 Cal.Rptr. 505, 725 P.2d 664.)
In Smith v. FEHC, the California Supreme Court acknowledged that our state Constitution is a document of independent force, and that we may not abandon settled applications of its terms every time changes are made in the manner in which the federal Constitution is interpreted. (Smith v. FEHC, supra, 12 Cal.4th at p. 1177, 51 Cal.Rptr.2d 700, 913 P.2d 909.) The court noted, however, that a search for the independent meaning of California's free exercise clause "entails a certain amount of frustration" because California courts before Smith typically treated the federal and state clauses as being interchangeable. (Id. at pp. 1177-1178, 51 Cal. Rptr.2d 700, 913 P.2d 909 [citing the cases relied on by Catholic Charities].) In addition, it noted that older cases applied an approach closer to that of Smith. (Id. at pp. 1178-1179, 51 Cal.Rptr.2d 700, 913 P.2d 909.)
Because the appellant's free exercise claim failed under the compelling interest standard of review required at that time by the RFRA (see fn. 6, ante), Smith v. FEHC found it unnecessary to address the scope and proper interpretation of the California Constitution. (Smith v. FEHC, supra, 12 Cal.4th at p. 1179, 51 Cal.Rptr.2d 700, 913 P.2d 909.)
Hence, the California Supreme Court has not determined that our state Constitution requires free exercise challenges to a neutral law of general application to be reviewed using the compelling interest test.
*197 Brunson v. Department of Motor Vehicles (1999) 72 Cal.App.4th 1251, 85 Cal. Rptr.2d 710 (review denied) (hereafter Brunson)decided by the Court of Appeal, Second Appellate District, Division Five, after the RFRA was found unconstitutional as applied to state governmental action-noted that no California Supreme Court case has ever articulated a standard applicable to the free exercise clause of California's Constitution different from that applicable to the United States Constitution. (Id. at pp. 1255-1256, 85 Cal. Rptr.2d 710.) On this basis alone, the Brunson court held, at page 1256, 85 Cal. Rptr.2d 710, that it was compelled to follow federal law and apply the rational basis test applicable to neutral laws of general application as set forth in Smith.
Catholic Charities claims that Brunson was "wrongly decided," in part because article I, section 24 of California's Constitution provides that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." Catholic Charities also points out the California Supreme Court has stated: "Respect for our Constitution as `a document of independent force' [citation] forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter." (People v. Pettingill (1978) 21 Cal.3d 231, 248, 145 Cal.Rptr. 861, 578 P.2d 108.)
What Catholic Charities overlooks is that Smith v. FEHC indicates there is no "settled application" of California's free exercise clause. All that is settled is this clause has no counterpart in the federal Constitution because it guarantees the free exercise and enjoyment of religion without discrimination or preference, whereas the federal charter simply bars Congress from enacting laws prohibiting the free exercise of religion. (Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 883, 281 Cal. Rptr. 34, 809 P.2d 809.) At most, the California Supreme Court has observed "`it might be argued that Section 4 offers broader protection [than the First Amendment] because it specifically refers to "liberty of conscience."' ..." (Smith v. FEHC, supra, 12 Cal.4th at p. 1179, fn. 22, 51 Cal.Rptr.2d 700, 913 P.2d 909; citation omitted.)
The fact California's Constitution offers broader protection does not ineluctably lead to the conclusion that neutral laws of general application must be subjected to the compelling interest test. A guarantee that one may freely exercise and enjoy one's religion without discrimination or preference is not the equivalent of a guarantee that one's religion may not be burdened incidentally by nondiscriminatory or nonpreferential laws absent compelling reasons. In fact, by stating "[t]his liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State," article I, section 4 of California's Constitution acknowledges that one's religious freedom may be curtailed in certain instances for the public good as long as the curtailment is not discriminatory.
Our interpretation of California's free exercise clause is supported by Ex Parte Andrews (1861) 18 Cal. 678, which rejected a constitutional challenge to a law requiring certain businesses to be closed on Sunday. The Supreme Court stated it understood the free exercise clause of article I, section 4 "to be an interdict against all legislation which invidiously discriminates in favor of or against any religious system. It does not interdict all legislation upon *198 subjects connected with religion.... The operation of the [Sunday closing law] is secular, just as much as the business on which the act bears is secular; it enjoins nothing that is not secular, and it commands nothing that is religious.... The mere fact that this regulation takes effect upon a day which has been appropriated as a day of rest by the sanctions of a particular church, no more destroys the power of the Legislature to command abstinence from labor on that day, than the fact that if the Legislature appointed certain public business to be done on Saturday or Sunday-this would have been `discriminating' against the sects, according religious sanctity to those days." (Id. at pp. 684-685, italics omitted.)
In Gospel Army v. City of Los Angeles (1945) 27 Cal.2d 232, 163 P.2d 704 (hereafter Gospel Army), the California Supreme Court upheld, as applied to a religious organization, municipal ordinances regulating charitable contributions and solicitations. Employees of the organization solicited money, food, and clothing from the public, and the contributions were used to pay employee salaries as well as the cost of furnishing religious tracts and literature, food, lodging, clothing, and carfare to the poor. (Id. at p. 234, 163 P.2d 704.) The organization claimed that, since it was engaged exclusively in religious activities, the ordinance was not applicable to its solicitations because the ordinances exempted solicitations made solely for evangelical, missionary, or religious purposes. (Id. at pp. 249-250, 163 P.2d 704.)
The Supreme Court disagreed that the solicitations were conducted solely for religious purposes, finding instead that they were conducted for charitable purposes within the meaning of the ordinances, i.e. for philanthropic, social service, benevolent, and patriotic purposes. Hence, the court held the ordinances were applicable to the religious organization because they did not exempt solicitations for charitable purposes, even if solicitations were undertaken by a religious organization. (Gospel Army, supra, 27 Cal.2d at p. 250, 163 P.2d 704.)
The religious organization argued that, since the practice of charity and the solicitation of funds for that purpose are part of its religious duties, the ordinances regulating the solicitation of charitable contributions abridged its religious liberty in violation of the United States and California Constitutions. (Gospel Army, supra, 27 Cal.2d at p. 242, 163 P.2d 704.) The Supreme Court disagreed: "Many activities prompted by religious motives can hardly be differentiated from secular activities. If the applicability of government regulation turned on the religious motivation of activities, plausible motivations would multiply and in the end vitiate any regulation.... [¶] Activities characteristic of the secular life of the community may properly be a concern of the community even though they are carried on by a religious organization. [Citations.] Religious organizations engage in various activities such as founding colonies, operating libraries, schools, wineries, hospitals, farms, industrial and other commercial enterprises. Conceivably they may engage in virtually any worldly activity, but it does not follow that they may do so as specially privileged groups, free of the regulations that others must observe. If they were given such freedom, the direct consequence of their activities would be a diminution of the state's power to protect the public health and safety and the general welfare." (Id. at pp. 243-245, 163 P.2d 704, text and citations omitted.)
Ex Parte Andrews and Gospel Army were cited by Smith v. FEHC, supra, *199 along with other California Supreme Court cases, as evidence that older California cases followed the Smith approach and did not require exemptions for religiously motivated conduct from neutral and generally applicable laws. (Smith v. FEHC, supra, 12 Cal.4th at p. 1179, 51 Cal.Rptr.2d 700, 913 P.2d 909, citing Gabrielli v. Knickerbocker (1938) 12 Cal.2d 85, 90-92, 82 P.2d 391 [declined to reinstate a public school pupil who was expelled for refusing, on religious grounds, to salute the flag]; Rescue Army v. Municipal Court (1946) 28 Cal.2d 460, 470, 171 P.2d 8 [upheld, as applied to religious organization, municipal ordinances regulating charitable contributions and solicitations].)
Unless and until the California Supreme Court rules otherwise, the application of the rule enunciated in Smith, supra, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 is consistent with the protections afforded by the free exercise clause of California's Constitution. As the United States Supreme Court pointed out in Smith: "`Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities....'" (Id. at p. 879, 110 S.Ct. at p. 1600, 108 L.Ed.2d at pp. 885-886, citation omitted.)
The Smith rule is particularly appropriate for reviewing free exercise challenges under our state Constitution given that the population in California is one of the most diverse in the nation, made up of people of almost every conceivable religious preference. We agree with Smith that "precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order. [Such a] rule ... would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind...." (Smith, supra, 494 U.S. at pp. 888-889, 110 S.Ct. at pp. 1605-1606, 108 L.Ed.2d at p. 892, text, citations, and italics omitted.)
Because we find that the same standard of review applies as was utilized in Smith, Catholic Charities's claim under the free exercise clause of the California Constitution fails for the reasons explained in our opinion, ante.

VII
Citing Larson v. Valente (1982) 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (hereafter Larson), "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another" (id. at p. 244, 102 S.Ct. at p. 1683, 72 L.Ed.2d at p. 47), Catholic Charities claims that the religious employer exemption in the prescription contraceptive coverage statutes violates the Establishment Clause of the United States Constitution as well as the California Constitution by exempting some religious employers but not others, thereby favoring certain religions over others. It argues that Larson dictates application of the strict scrutiny test where there is such a facial preference between religions, and that the religious employer exemption cannot withstand such scrutiny.[6]
*200 Catholic Charities is correct that, if the law grants a denominational preference, it may be upheld only if it is supported by a compelling state interest. (Larson, supra, 456 U.S. at pp. 246-247, 102 S.Ct. at pp. 1683-1685, 72 L.Ed.2d at pp. 49-50; Children's Health., supra, 212 F.3d at p. 1090.) If no such facial preference exists, we apply the Establishment Clause inquiry derived from Lemon v. Kurtzman (1971) 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (hereafter Lemon). (Hernandez v. Commissioner (1989) 490 U.S. 680, 695, 109 S.Ct. 2136, 2146, 104 L.Ed.2d 766, 784; Children's Health., supra, 212 F.3d at pp. 1092-1093.)
A law need not expressly distinguish between religions by sect name to facially discriminate among religions. (Larson, supra, 456 U.S. at pp. 232, fn. 3, 246, 102 S.Ct. at pp. 1677, fn. 3, 1684, 72 L.Ed.2d at pp. 40, fn. 3, 49; Children's Health, supra, 212 F.3d at p. 1090.) Objective factors such as the law's legislative history and its practical effect while in operation can evidence such discrimination. (Lukumi supra, 508 U.S. at pp. 535, 540, 113 S.Ct. at pp. 2227, 2230, 124 L.Ed.2d at pp. 491-492, 495; Larson, supra, 456 U.S. at p. 254, 102 S.Ct. at p. 1688, 72 L.Ed.2d at p. 54.)
Catholic Charities reiterates its belief that the religious exemption in the prescription contraceptive coverage statutes was carefully gerrymandered to discriminate against the Catholic Church. It believes the facts of this case are indistinguishable from the facts in Larson, supra, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33. We disagree.
In Larson, a Minnesota charitable solicitation statute was amended to facially exempt from state registration and reporting requirements only those religious organizations that derived more than half their funds from members. Prior to the statute's amendment, all religious organizations were exempted from the reporting requirement. (Larson, supra, 456 U.S. at pp. 231-232, 102 S.Ct. at pp. 1676-1677, 72 L.Ed.2d at pp. 39-10.) The history of the amendment revealed that it was "drafted with the explicit intention of including particular religious denominations and excluding others" and that it was based on hostility to "Moonies," members of the Unification Church, who solicited donations at airports. (Id. at p. 254, 102 S.Ct. at p. 1688, 72 L.Ed.2d at p. 54.) The wording of the proposed amendment was changed so the Roman Catholic Archdiocese would be exempted but the Unification Church would not be similarly exempt. (Ibid.)
This 50 percent rule effectively distinguished between (1) well-established churches that had achieved strong financial support from their members, and (2) churches that were newer and lacked a constituency, or that favored public solicitation over reliance on financial support from members. Therefore, it was not a facially neutral statute, the provisions of which happened to have a disparate impact upon different religious organizations. (Larson, supra, 456 U.S. at pp. 246-247, fn. 23, 102 S.Ct. at pp. 1684-1685, fn. 23, 72 L.Ed.2d at pp. 49-50, fn. 23.) Rather, the 50 percent rule deliberately distinguished between different religions in a manner that assured only certain religions would receive the benefit of the exemption. (Ibid.)
Larson is of no assistance to Catholic Charities. It simply "indicates that laws discriminating among religions are subject to strict scrutiny, ... and that laws `affording a uniform benefit to all religions' should be analyzed under Lemon...." (Amos, supra, 483 U.S. at p. 339, 107 S.Ct. at p. 2870, 97 L.Ed.2d at p. 285, citations omitted, italics omitted.)
*201 Here, the language of the religious employer exemption in the prescription contraceptive coverage statutes is sect-neutral. It does not include or disqualify any sect by name, or make deliberate distinctions that serve to include certain sects while excluding others. (Cf. Hernandez v. Commissioner, supra, 490 U.S. at pp. 683, 695-696, 109 S.Ct. at pp. 2140, 2146-2147, 104 L.Ed.2d at pp. 776, 783-784 [tax code provisions on charitable donations to organizations organized and operated for religious purposes are not subject to strict scrutiny because they do not discriminate between sects]; Children's Health., supra, 212 F.3d at pp. 1088-1091 [Medicare and Medicaid amendments extending benefits to religious nonmedical healthcare institutions are not subject to strict scrutiny since they do not discriminate between sects].)
The Catholic Church benefits from the exemption, as do all other religions; the exemption simply does not cover all of its organizations, such as Catholic Charities. Because the same is true for all other religions' ancillary organizations, all religions are equally burdened and benefited. As long as the exemption applies to all religions equally, the fact that it does not encompass all conceivable religious employers does not render it unconstitutional. (Cf. Droz v. Commissioner of I.R.S., supra, 48 F.3d at p. 1124 [exemption from Social Security tax given to members of religious sects that have tenets opposed to the acceptance of public benefits, but not to individuals who share the same religious beliefs but are not a member of such a sect, does not violate the Establishment Clause because of valid secular purpose for limiting the exemption in this manner].)
In any event, even if the narrow definition of "religious employer" is construed as having a disparate impact, this is insufficient to make the exemption facially discriminatory. (Children's Health., supra, 212 F.3d at p. 1091.) "[A] claimant alleging `gerrymander' must be able to show the absence of a neutral, secular basis for the lines government has drawn." (Gillette v. United States, supra, 401 U.S. at p. 452, 91 S.Ct. at p. 837, 28 L.Ed.2d at p. 182 [limiting religious "conscientious objector" exemption from the draft to those opposed to all wars, rather than to particular wars viewed as "unjust," did not violate the Establishment Clause because the exemption was available on an equal basis and had a valid neutral and secular purpose]; compare Lukumi, supra, 508 U.S. at p. 535, 113 S.Ct. at 2228, 124 L.Ed.2d at p. 492.)
Catholic Charities has not made such a showing. As we have discussed previously, limiting the religious employer exemption to cover only what can be termed "sectarian" religious employers reflects valid secular justifications, and does not constitute a religious gerrymander subject to strict scrutiny.
Catholic Charities disagrees, claiming the Legislature impermissibly injected itself into church affairs by redefining the Catholic Church and carving it up into religious and secular segments. Citing Mitchell v. Helms (2000) 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (hereafter Mitchell), Catholic Charities argues that the Legislature may not undertake an analysis regarding whether an entity is religious or secular as this is based on the "pervasively sectarian" doctrine rejected by the Supreme Court. In Catholic Charities's view, the religious employer exemption is infirm since it distinguishes between religious employers who are engaged in sectarian pursuits and those engaged in more secular pursuits, such as providing social services.
*202 In Mitchell some taxpayers challenged a school aid program, alleging it violated the Establishment Clause by providing aid to parochial schools. Under the program, the federal funds are distributed to state and local governmental agencies, which in turn lend educational materials and equipment to public and private schools, including parochial schools. (Mitchell, supra, 530 U.S. at pp. 801-803, 120 S.Ct. at pp. 2536-2537, 147 L.Ed.2d at pp. 670-672.) Several restrictions apply to aid provided to private schools, including that the "`services, materials, and equipment'" must be "`secular, neutral, and nonideological.'" (Id. at p. 802, 120 S.Ct. at 2537, 147 L.Ed.2d at p. 671.)
Mitchell held the program did not constitute government endorsement of religion in violation of the Establishment Clause. The court concluded that some direct, nonincidental government aid to religious schools is permissible if it is available neutrally to both secular and religious schools on a nondiscriminatory basis, if the aid is not itself unsuitable for use in public schools because of religious content, and if eligibility for aid is determined in a constitutionally permissible manner. (Mitchell, supra, 530 U.S. at pp. 809-829, 120 S.Ct. at 2539-2550, 147 L.Ed.2d at pp. 675-686.)
The plurality in Mitchell also stated the Establishment Clause does not require the exclusion of pervasively sectarian schools from otherwise permissible aid programs. (Mitchell, supra, 530 U.S. at pp. 825-829, 120 S.Ct. at pp. 2548-2552, 147 L.Ed.2d at pp. 686-688.) At one time, whether school aid was unconstitutional depended upon whether the recipient school was "pervasively sectarian." (Id. at p. 826, 120 S.Ct. at p. 2550, 147 L.Ed.2d at p. 686.) The plurality indicated this factor no longer should be used, stating "the inquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." (Id. at p. 828, 120 S.Ct. at p. 2551, 147 L.Ed.2d at p. 687.) The plurality noted that "the religious nature of a recipient should not matter to the constitutional analysis, so long as the recipient adequately furthers the government's secular purpose." (Ibid.)
Catholic Charities's reliance on Mitchell is misplaced for the following reasons.
First, "[i]t is well settled that in a plurality opinion, `the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' ... In Mitchell, there is no single part of any opinion that commands the support of a majority of the Court. As a result, the only binding precedent of Mitchell is the holding." (Steele v. Industrial Dev. Bd. of Metropolitan Gov. (M.D.Tenn.2000) 117 F.Supp.2d 693, 706, citations omitted.)
Second, Catholic Charities's challenge does not concern government financial aid to sectarian schools or organizations. The Legislature has not denied aid to religious organizations on the basis of the sectarian nature of the organizations. Rather, it has granted a beneficial exemption to religious organizations, while excluding "seculartype" religious organizations because extending the exception to such organizations will unduly interfere with the state's secular purpose of eliminating gender discrimination in health insurance coverage. Nothing in Mitchell prohibits this.
*203 Contrary to Catholic Charities's assertion, the Legislature is not defining the Catholic Church, or any other church for that matter, nor dictating the manner in which the Catholic Church is to conduct its internal affairs. The Legislature simply has defined the type of employers that fall within the religious employer exemption, and has done so in a manner necessary to effectuate the secular purpose of the prescription contraceptive coverage statutes. This is entirely permissible. The government is not compelled to accept a religious organization's self-definition in determining the coverage of employment regulation. (Dole v. Shenandoah Baptist Church (4th Cir.1990) 899 F.2d 1389, 1396 [rejecting religious school's Establishment Clause claim that it was entitled to religious exemption from the Fair Labor Standards Act because its Church was exempt, labor laws could not permissibly differentiate between the two, and the government was required to accept the church's characterization of the school as an inseverable part of the church].)
Accordingly, we must use the threepronged test set forth in Lemon, supra, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, which provides that, to withstand an Establishment Clause challenge, a statute must have a secular legislative purpose, its primary purpose must neither advance nor inhibit religion, and the statute must not foster excessive government entanglement with religion. (Id. at pp. 612-613, 91 S.Ct. at 2111-2112, 29 L.Ed.2d at p. 755.) As the California Supreme Court has noted, the Lemon test "is ill-suited to evaluating an establishment clause challenge to a law that creates an exemption for religious bodies from a neutral law of general application," but it is the appropriate test to use. (East Bay, supra, 24 Cal.4th at p. 706, 102 Cal.Rptr.2d 280, 13 P.3d 1122.)
For reasons that follow, we conclude the exemption is constitutional under the Lemon test.
The first requirement of the test is that the statutes have a secular legislative purpose. This does not mean the law's purpose must be unrelated to religion, just that the government has not abandoned neutrality and acted with the intent of promoting a particular point of view in religious matters. (Amos, supra, 483 U.S. at p. 335, 107 S.Ct. at p. 2868, 97 L.Ed.2d at pp. 282, 283; Ehlers-Renzi v. Connelly School of the Holy Child, supra, 224 F.3d at p. 288.)
The Legislature did not have such an impermissible intent when it enacted the religious employer exemption in the prescription contraceptive coverage statutes. The valid secular purpose was to accommodate those who oppose contraception on religious grounds without undermining the public policy goal of eliminating gender discrimination in insurance benefits at the expense of employees who do not share their employer's religious tenets. This is a rational, nondiscriminatory reason for limiting the exemption.
A statute "does not violate the second part of the Lemon test [whether the primary effect of the statute impermissibly enhances or inhibits religion] merely because it gives special consideration to a religious group or even because it better enables a religious institution to advance its cause." (Children's Health, supra, 212 F.3d at p. 1095.) Rather, "it must be fair to say that the government itself has advanced religion through its own activities and influence," rather than advancement coming from the religious organization itself. *204 (Amos, supra, 483 U.S. at p. 337, 107 S.Ct. at p. 2869, 97 L.Ed.2d at pp. 283-284, orig. italics.) Nor will a statute violate the second part of the Lemon test where it "[does] not or would not impose substantial burdens on nonbeneficiaries while allowing others to act according to their religious beliefs," or where it is "designed to alleviate government intrusions that might significantly deter adherents of a particular faith from conduct protected by the Free Exercise Clause." (Texas Monthly, Inc. v. Bullock (1989) 489 U.S. 1, 18, fn. 8, 109 S.Ct. 890, 901, fn. 8, 103 L.Ed.2d 1, 15, fn. 8, italics added.)
Catholic Charities does not appear to believe that the enactment of prescription contraceptive coverage statutes with a limited religious employer exemption impermissibly enhances religion. And by no stretch of the imagination can it be said that the ability of the exemption's beneficiaries to propagate their religious doctrine is greater now than it was before the statutory scheme was enacted, or that the government itself has advanced religion through its own activity of enacting statutes designed to eliminate gender discrimination in insurance benefits. (Amos, supra, 483 U.S. at p. 337, 107 S.Ct. at p. 2869, 97 L.Ed.2d at p. 283-284.)
What Catholic Charities suggests is that, by excluding from the religious employer exemption a religious entity's ancillary organizations that are engaged in secular activities, the statutory scheme impermissibly inhibits religion. We disagree. When such an organization elects to provide its employees with health or disability insurance coverage with prescription drug benefits, requiring the policies to cover prescription contraceptive methodsso as not to discriminate against womencannot be said to inhibit religion, even if its parent entity is a religious organization that believes the use of contraceptives is a sin. Being compelled to provide such coverage cannot be viewed as endorsing the use of contraceptives; to the contrary, the organization remains free to advise its employees that it is morally opposed to prescription contraceptive methods and to counsel them to refrain from using such methods. For us to conclude otherwise would mean that such a provider of secular services could impose its own religious views on its employees by refusing to provide them with health coverage that is available to the employees of other entities performing secular services. That, we think, is not what the Establishment Clause stands for. And, to the extent compelling that coverage will result in added costs to such organizations which elect to provide health or disability policies to their employees, this burden is "too minimal and diffuse to violate the second part of the Lemon test." (Children's Health., supra, 212 F.3d at p. 1096.)
As reflected in the legislative history we have summarized, ante, the narrowly-defined religious employer exemption in the prescription contraceptive coverage statutes was "designed to alleviate government intrusions that might significantly deter adherents of a particular faith from conduct protected by the Free Exercise Clause." (Texas Monthly, Inc. v. Bullock, supra, 489 U.S. at p. 18, fn. 8, 109 S.Ct. at p. 901, fn. 8, 103 L.Ed.2d at p. 15, fn. 8.) Accordingly, the exemption cannot be said to violate the second prong of the Lemon test. (Ibid.)
This brings us to the third part of the Lemon test, the statute must not foster excessive government entanglement with religion. "Although it is difficult to attach a precise meaning to the word `entanglement,' courts have found an unconstitutional *205 entanglement with religion in situations where a `protracted legal process pit[s] church and state as adversaries,' [citation] and where the Government is placed in a position of choosing among `competing religious visions.' [Citation.]" (E.E.O.C. v. Catholic University of America, supra, 83 P.3d at p. 465.) Therefore, excessive entanglement has been found "where religious and state employees must work closely together to carry out the statutory scheme, when the state becomes involved in scrutinizing religious content or when enforcement requires government investigators to make on site inspections or engage in surveillance of the religious organization to ensure a secular purpose is served." (Jimmy Swaggart Ministries v. State Bd. of Equalization (1988) 204 Cal. App.3d 1269, 1288, 250 Cal.Rptr. 891, affd. (1990) 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796.) In other words, there is a distinction between regulatory action that requires ongoing government supervision and that which requires a limited inquiry. (DeMarco v. Holy Cross High School (2d Cir.1993) 4 F.3d 166, 169-170.)
Catholic Charities briefly asserts there is excessive governmental entanglement with respect to the religious employer exemption because, in its view, the state must undertake prolonged monitoring and "engage in rendering theological judgments" to determine whether a religiousaffiliated employer qualifies for the exemption. We are not persuaded.
First, the statutes do not require state certification or any other input from the state as to whether an entity is a "religious employer." (Health & Saf.Code, § 1367.25, subd. (b); Ins.Code, § 10123.196, subd. (d).) Unless the insurer disputes an entity's entitlement to a policy without coverage for contraceptive methods, or an employee questions the entity's "religious employer" status, the state will not be involved.
Second, determining whether the exemption applies involves a limited inquiry regarding whether the entity's religious tenets oppose contraception and its primary purpose is the inculcation of religious values, a statistical inquiry about the number of employees and persons served by the entity who share the entity's opposition to contraception, and an objective legal inquiry regarding the entity's tax status.
As to the first inquiry, the state must accept an entity's assertion that contraception is contrary to its religious tenets. (Cf. Smith v. FEHC, supra, 12 Cal.4th at pp. 1167-1168, 51 Cal.Rptr.2d 700, 913 P.2d 909; DeMarco v. Holy Cross High School, supra, 4 F.3d at pp. 171-172.) Because the state has conceded that opposing the use of contraception is a valid religious tenet, there would be no questioning that belief qualifies as "religious." Hence, there would be no questioning about the entity's religious values, other than whether the entity's purpose is the inculcation of others with those values, whatever they may be. This latter inquiry does not require excessive government entanglement because it turns not upon a subjective evaluation of the religious motivation of the entity's activities but upon an assessment of whether, by an objective standard, the activities are "characteristic of the secular life of the community" (Gospel Army, supra, 27 Cal.2d at p. 244, 163 P.2d 704), such as the services provided by Catholic Charities.
Accordingly, there is no ongoing or continuous supervision of the religious employer and no interpretation of church doctrines and the importance of these doctrines to the religious employer; and the state is not placed in a position of choosing among competing religious visions.
*206 In sum, enforcement of the statutory scheme does not require excessive intrusion into religious affairs. (Cf. Tony & Susan Alamo Foundn. v. Sec. of Labor (1985) 471 U.S. 290, 305-306, 105 S.Ct. 1953, 1963-1964, 85 L.Ed.2d 278, 290-291 [applying Fair Labor Standards Act's recordkeeping requirements to a nonprofit religious foundation does not violate the Establishment Clause]; Geary v. Visitation of the Blessed Virgin Mary (3d Cir. 1993) 7 F.3d 324, 328 [applying Age Discrimination in Employment Act to the lay faculty of a religious school does not present a significant risk of entanglement]; E.E.O.C. v. Fremont Christian School, supra, 781 F.2d at p. 1370 [applying Title VII to regulate religious employers' employee compensation is not an impermissible entanglement with religion].)
Catholic Charities also protests that the definition of "religious employer" is difficult to apply and uncertain in its application. (Citing Amos, supra, 483 U.S. at p. 336, 107 S.Ct. at p. 2868, 97 L.Ed.2d at p. 283 [it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious.].) Again, we disagree. The statutory definition of the religious employer exemption provides discrete criteria that enable a religious employer to easily determine whether the exemption applies. The employer must be an entity coming within the provisions of a specific tax code section, must employ and serve primarily people who share the employer's religious tenets opposing contraception, and the entity's purpose must be the inculcation of religious values and not simply to engage in "religious activities."

VIII
For all of the reasons stated above, Catholic Charities has failed to establish that it is likely to prevail on the merits of its constitutional challenges. Accordingly, the superior court properly denied Catholic Charities's request for a preliminary injunction pending trial.[7]

DISPOSITION
The petition for a writ of mandate is denied. Having served its purpose, the alternative writ is discharged.
MORRISON, J., and CALLAHAN, J., concur.
NOTES
[1] Health and Safety Code section 1367.25 provides in pertinent part: "(a) Every group health care service plan contract, except for a specialized health care service plan contract, that is issued, amended, renewed, or delivered on or after January 1, 2000, and every individual health care service plan contract that is amended, renewed, or delivered on or after January 1, 2000, except for a specialized health care service plan contract, shall provide coverage for the following, under general terms and conditions applicable to all benefits: [¶] (1) A health care service plan contract that provides coverage for outpatient prescription drug benefits shall include coverage for a variety of federal Food and Drug Administration approved prescription contraceptive methods designated by the plan. In the event the patient's participating provider, acting within his or her scope of practice, determines that none of the methods designated by the plan is medically appropriate for the patient's medical or personal history, the plan shall also provide coverage for another federal Food and Drug Administration approved, medically appropriate prescription contraceptive method prescribed by the patient's provider."

Insurance Code section 10123.196 provides in pertinent part: "(a) Every individual and group policy of disability insurance issued, amended, renewed, or delivered on or after January 1, 2000, that provides coverage for hospital, medical, or surgical expenses, shall provide coverage for the following, under the same terms and conditions as applicable to all benefits: [¶] (1) A disability insurance policy that provides coverage for outpatient prescription drug benefits shall include coverage for a variety of federal Food and Drug Administration (FDA) approved prescription contraceptive methods, as designated by the insurer. If an insured's health care provider determines that none of the methods designated by the disability insurer is medically appropriate for the insured's medical or personal history, the insurer shall, in the alternative, provide coverage for some other FDA approved prescription contraceptive method prescribed by the patient's health care provider."
[2] The statutes require religious employers to provide notice to prospective employees that they do not cover contraceptive health care services for religious reasons. (Health & Saf. Code, § 1367.25, subd. (b)(2); Ins.Code, § 10123.196, subd. (d)(2).) The statutes also provide: "Nothing in this section shall be construed to exclude coverage for prescription contraceptive supplies ordered by a health care provider with prescriptive authority for reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause, or for prescription contraception that is necessary to preserve the life or health" of an enrollee or insured. (Health & Saf.Code, § 1367.25, subd. (c); Ins.Code, § 10123.196, subd. (e).)
[3] It appears Catholic Charities does not currently offer disability insurance benefits to its employees. The first amended complaint alleges that Catholic Charities is seriously contemplating offering long-term disability benefits to its employees but, because of the mandate imposed by Insurance Code section 10123.196, it is unable to obtain a group disability insurance policy that does not include coverage for prescription contraceptives. Thus, Catholic Charities argued, absent the requested declaratory and injunctive relief sought, it is precluded from obtaining the desired disability insurance coverage for its employees due to the burden Insurance Code section 10123.196 places on its religious beliefs.

The Attorney General contends that the mere possibility Catholic Charities might obtain disability insurance for its employees in the future is too conjectural to justify present injunctive relief with respect to Insurance Code section 10123.196 because Catholic Charities cannot show it is currently injured. Since we must address Catholic Charities's constitutional challenges to Health and Safety Code section 1367.25, which are identical to those raised with respect to Insurance Code section 10123.196, we need not address the Attorney General's procedural argument. As we will explain, because Catholic Charities's constitutional challenges to Health and Safety Code section 1367.25 fail, its challenges to Insurance Code section 10123.196 necessarily fail as well.
[4] In response to Smith, Congress enacted the Religious Freedom Restoration Act (RFRA) to restore the compelling interest test set forth in Sherbert, supra, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 and Wisconsin v. Yoder (1972) 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15. (42 U.S.C. § 2000bb(b)(1).) But the United States Supreme Court has declared the RFRA unconstitutional as applied to state and local governmental action. (City of Boerne v. Flores (1997) 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624; See also People v. Trippet (1997) 56 Cal.App.4th 1532, 1541, 66 Cal. Rptr.2d 559; Sutton v. Providence St. Joseph Medical Center (9th Cir.1999) 192 F.3d 826, 832.)
[5] Article I, section 4 of the California Constitution provides in pertinent part: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

The First Amendment of the United States Constitution provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."
[6] Because California's Establishment Clause offers no more protection than that of the federal Constitution (East Bay, supra, 24 Cal.4th at pp. 718-719, 102 Cal.Rptr.2d 280, 13 P.3d 1122), we shall address these claims together.
[7] Amicus curiae briefs have been filed by numerous different entities. To the extent that those briefs raise arguments not presented in Catholic Charities's petition for writ of mandate or raise arguments that were not tendered in the superior court, we decline to address them. Amicus curiae must accept the issues urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered. (California Assn. for Safety Education v. Brown (1994) 30 Cal.App.4th 1264, 1274-1275, 36 Cal.Rptr.2d 404.)